MARGARETTA T. PHILLIPS, and MARGARETTA T. PHILLIPS, as Administratrix of the Estate of OLEN F. PHILLIPS, deceased, and BAYARD W. ALLMOND, Guardian *Ad Litem* for WENONA PHILLIPS and ROBERT H. PHILLIPS, minors,

*vs.*

JULIA S. WILLIS.

*New Castle, January. 3, 1949.*

*W. Thomas Knowles,* of the firm of Knowles & Allmond, for Margaretta T. Phillips, individually and as administratrix.

*Bayard W. Allmond,* guardian *ad litem* for Wenona Phillips and Robert H. Phillips.

*Reuben Satterthwaite, Jr.,* and *William S. Satterthwaite,* of the firm of Satterthwaite & Satterthwaite, for defendant.

SEITZ, Vice-Chancellor: Plaintiffs seek to impress a trust for the benefit of an estate on certain preferred stock purchased by the defendant allegedly in violation of her duty as a confidential agent.

Olen F. Phillips, hereinafter called the "deceased," died intestate on June 1, 1932. He was survived by his widow, Margaretta T. Phillips and two minor children, Wenona and Robert H. Phillips.

Aside from assets valued at $665.71, the sole asset of the estate of the deceased was his ownership of all of the stock of Olen F. Phillips Realty Company, hereinafter called the "Company." This Company, whose only assets consisted of the ownership of some six apartment houses in the city of Wilmington, had outstanding at the death of the deceased some 682½ shares of common voting stock and 455 shares of $100 par 8% cumulative preferred stock.

At the death of the deceased in 1933, his estate was insufficient to pay his debts. In his lifetime he had pledged

532½ shares of the common stock of the Company with the Central National Bank of Wilmington to secure a debt which he had contracted. He had also pledged 355 shares of his preferred stock with the Salisbury National Bank to secure his liability as endorser on his brother's note— that is the stock in dispute. Thus, the deceased at his death had possession of only 150 shares of the common and 100 shares of the preferred stock of the Company. It also appears that at his death the preferred and common stock had little if any value because of the Company's heavy obligations.

In August, 1932, which was shortly after her husband's death, Mrs. Phillips employed the defendant, Julia S. Willis, to manage the affairs of the Company. The defendant had worked for the Company part-time for a period during the lifetime of the deceased, but she was not so employed at his death. The evidence shows that prior to assuming her Company and estate duties in 1932, the defendant had substantial experience in the business world, particularly as a bookkeeper.

From 1932, until this complaint was filed in April, 1948, and indeed even up to the time of the hearing, the defendant had almost exclusive control of the affairs of the Company. The defendant was employed by the Company in 1932 at a salary of $25.00 a week. In 1938 her salary was raised to $40.00 a week. The Company has also provided her with a rent-free apartment. Since 1933, the defendant has been a director, secretary and treasurer, and office agent of the Company.

Mrs. Phillips, widow of the deceased, has been president and a director of the Company since about 1933. While she drew a salary until about 1936 and has had the rent-free use of an apartment, I gather that her services to the Company were relatively small. Although she was administratrix, I conclude from the evidence that she did very little in connection with the complicated estate affairs. On the

other hand, since 1932 the defendant has managed the Company by collecting the rents, seeing to the repairs, and arranging the many other matters which ordinarily go with the managing of six substantial apartment houses. The defendant has also settled the debts of the estate by compromise and payment, and largely by loaning her own money. Her management has been so successful that there are now no estate debts and the Company is in a good financial condition. However, no dividend has been paid on the preferred stock for at least twenty years. Since this stock is cumulative, it is apparent that a large arrearage has accumulated.

The present controversy relates to the 355 shares of preferred stock pledged by the deceased with the Salisbury National Bank to secure his endorser liability. The controversy arises because in 1944 the Salisbury Bank sold the preferred stock to the defendant for $750. The defendant purchased the stock with her own money and subsequently had a new stock certificate therefor issued in her own name. Plaintiff claims that as to estate matters the defendant was the confidential agent of the plaintiff and that as such she could not purchase this stock for her own benefit without a complete disclosure to plaintiff. Plaintiff contends that such a disclosure was never made. The guardian for the minor children contends that as to their interests there was no disclosure and assent of the type necessary to bind the interest of the children.

The defendant concedes that at all times here involved she was the confidential agent of Mrs. Phillips, but she justifies the purchase of the estate stock in her own name on the ground that she made a full disclosure of her intention to Mrs. Phillips. However, the defendant testified that she purchased the stock with the intention of looking after the interests of Mrs. Phillips. It appears that she overlooked the claim of the minor children, or assumed that Mrs. Phillips as their natural guardian could bind them.

To reach a solution in this matter, it is necessary to scrutinize some of the evidence very carefully.

Without detailing the financial history of the Company and of the estate over the years since 1932, it may be stated that both had many serious financial problems due to the large obligations of the Company and of the estate. However, certainly by June 18, 1943, the Company's financial picture was vastly improved. This fact is evidenced by certain recitals which appear in the minutes of a meeting of the Company's directors on June 18, 1943. At the meeting held on that date the directors rejected an offer to purchase the Company's property for $160,000 for the reason, as the minutes state, "that it was not sufficient to pay all claims. It was also taken into consideration that the business is now operating at a profit and is in better condition than for many years past." The minutes of this meeting were signed by the defendant as secretary. It is conceded that the reference to "all claims" necessarily included the estate as well as the Company claims.

On July 19, 1943, the defendant used her own money to pay the estate obligation due the Central National Bank of Wilmington, which obligation had been secured by the 532½ shares of the Company's common stock. To secure this payment by her of $3,178.31 to the bank for the benefit of the estate, the defendant took a note from the administratrix secured by a pledge of the same 532½ shares of common stock.

We come now to the defendant's purchase of the stock here in dispute. On or about October 29, 1943, the defendant purchased from the Salisbury National Bank the 355 shares of preferred stock held by the bank to secure the endorser obligation of the deceased. Although the endorser obligation of the deceased was apparently as great as $11,-000, the defendant paid the bank only $750 for the stock. By an instrument dated December 28, 1943, the Salisbury National Bank released the estate from all liability in con-

nection with this matter for the recited consideration of $750. It was further recited that the $750 had been received by it from the sale of the collateral represented by the 355 shares of preferred stock. The pledged certificate is in evidence. Across its face there is written in ink: "Cancelled Margaretta T. Phillips August 4, 1944." A new certificate for these 355 shares was made out in the name of the defendant Julia Scott Willis and dated August 4, 1944. The new certificate was signed by Margaretta T. Phillips as president and Julia S. Willis as secretary. Later corporate records also show a waiver of minutes signed by Mrs. Phillips and the defendant as stockholders.

During the years 1945 and 1946, the defendant compromised and settled the remaining claims against the estate. She settled estate claims aggregating about $28,-000 for $1,995.32. The money to compromise these claims was advanced by the defendant, who in 1946 received an estate note therefor, also secured by a pledge of the 532½ shares of the common stock.

The first harbinger of future discord appeared early in 1948 when the subject of selling the apartment houses once again came before a meeting of the board of directors. Some of the possible methods of selling the apartment houses were apparently discussed, and for the first time Mrs. Phillips became aware that she would need legal advice insofar as the estate was concerned. Mrs. Phillips testified that she did not know that the defendant had the 355 shares of preferred stock formerly pledged with the Salisbury National Bank registered in her own name until her attorney so discovered in 1948. This litigation was the sequel.

Since this is essentially a suit charging the defendant with having abused a confidential relationship, it becomes pertinent to consider the parties involved and their relationship toward one another. Mrs. Phillips, widow of the deceased, has been a nurse for a great many years. When her husband died in 1932 she was a relatively young woman,

left with two children about two and four years of age respectively. At the time of her husband's death, Mrs. Phillips did not live in Delaware and apparently had no knowledge of the affairs of the Company. Her lack of general business acumen was apparent on the witness stand.

On the other hand, the defendant had worked for the Company for several years and had also held numerous bookkeeping positions which gave her substantial experience in this facet of the business world. It is conceded that the defendant had almost exclusive control of the affairs of the estate and of the Company during the period in question. I find as a fact that Mrs. Phillips relied completely upon the defendant and followed whatever instructions she was given by the defendant with respect to handling the affairs of the Company and of the estate. Having this background in mind, let us attempt to fill in the details of the transaction under attack.

In October, 1943 a representative of the Salisbury National Bank communicated with Mr. Willard Springer, President of Industrial Trust Company in Wilmington, stating that the estate stock held as collateral by the Salisbury National Bank was to be sold. Mr. Springer was also a director of the Company because his bank was one of its large creditors. He had always dealt with the defendant rather than Mrs. Phillips in connection with the affairs of the Company. The defendant testified that Mr. Springer called her and told her that the stock was for sale. The defendant authorized Mr. Springer to buy the stock for her for $750. This he did. Mr. Springer communicated only with the defendant concerning the possibility of purchasing the stock, although it was held by the Salisbury Bank as collateral for an estate obligation. Mr. Springer's testimony is somewhat at variance with the defendant's, but the essential facts are the same. He testified that the defendant assured him that while she was purchasing the stock for herself, she would look after the interests of Mrs.

Phillips. Just how she would do this Mr. Springer was unable to say. Apparently neither Mr. Springer nor the defendant considered that it might be desirable to buy the stock for the estate. Mr. Springer also testified that he saw no objection to the defendant purchasing the stock in her own name. Since Mr. Springer seemed unaware of the legal duties flowing from the confidential relationship existing between the defendant and Mrs. Phillips, I believe his testimony on this point must be greatly minimized.

It is undisputed that the defendant bought the stock for $750 on October 29, 1943. However, the new certificate issued in her name was not issued until August 4, 1944. I need not decide the possible significance of the defendant's delay in procuring the new certificate. The defendant testified that while she purchased the stock in her own name, she intended to look after Mrs. Phillips' interests. She did not testify as to exactly what she meant by this condition. However, in her answer she takes the position that, as to the pledged stock, she is entitled to all of the stock which Mrs. Phillips would receive as a beneficiary of the estate and, as to the children, she claims some equitable number of their shares for having saved their interests in the estate. I shall assume that this lawsuit altered the defendant's former intention with respect to looking after Mrs. Phillips' interests.

When the defendant purchased the pledged preferred stock on October 29, 1943, she was most assuredly the confidential agent of Mrs. Phillips with respect to the affairs of the estate. I need not stress the relatively high standard by which the actions of an agent are judged in his dealings with his principal. As this court said in *Allen v. Adams*, 16 *Del. Ch.* 77, 81, 140 *A.* 694, 696, "The first duty an agent owes to his principal is that of loyalty to the trust he has assumed." An inextricable part of this duty is the rigid obligation of the agent to make a full and understandable disclosure to his principal before he may

even deal in the subject matter of the agency, let alone purchase his principal's property. See generally *Peyton v. William C. Peyton Corporation*, 23 *Del. Ch.* 321, 7 *A.* 2d 737, 123 *A.L.R.* 1482. See *Bradford vs. Vinton*, 17 *Del. Ch.* 261, 153 *A.* 678. The defendant concedes that she was subject to this high duty, but she contends that she made a full and understandable disclosure to Mrs. Phillips at the time she purchased the stock for herself. Thus, she testified:

"Q   Now, at about this time in the fall of 1943 did you have any discussions with Mrs. Phillips as to this preferred stock?

"A   Yes, I did.

"Q   Will you state what they were?

"A   Well, I told Mrs. Phillips that the bank was going to sell that stock and that I was going to try to buy it, and I said, 'I feel it is better for me to have it than an outsider, in't it?'

"Mrs. Phillips agreed that it was.

"Q   Did she show any interest in purchasing this stock herself?

"A   No.   Mrs. Phillips didn't say anything about it.

"Q   Did she make any objection to your purchasing it?

"A   Not at all.

"Q   Did you make it clear to her when you discussed it with her—

"A   Yes, indeed I did.

"Q   Let me finish the question.   (Continuing) that you intended to purchase the stock yourself?

"A   Oh, yes.

"Q   Were these conversations held with her before you discussed this matter with Mr. Springer, or afterwards, or both?

"A   I guess both, because I heard the stock was for sale and then I told Mrs. Phillips, and I am not sure whether—I think it was after that that I told Mr. Springer to try to buy the stock for me.

"Q   But Mrs. Phillips understood that you intended to buy the stock yourself, and showed no interest in buying it herself?

"A   Didn't express any.

"Q   Nor express any objection to your buying it?

"A   No objection to me buying it.

"By the Court:

"Q  Mrs. Willis, did she know what the effect of that would be?

"A  Well, I would think so.

"Q  Well, did you know at the time?

"A  The effects?  No, I didn't think about that.  I only thought about getting it.  I only thought that far ahead because we had been so upset about this common stock transaction, and then this came up, and I was just so anxious to keep someone else from putting us out— that was the whole thing.

\* \* \* \* \* \*

"Q  At the time you made the purchase of this stock, Mrs. Willis, what was your intention as to its ultimate ownership?

"A  Well, it was—at the time I purchased it?  Or after I had had time to think it out?  Well, my thought was to share that stock.  I hadn't thought of keeping it all.  I only thought of it in value of dividends.  It hadn't paid dividends for over forty years, I think since 1923, and I had never thought then of selling the buildings.  I only thought of the value in dividends, and I knew it would be many years if ever that it paid dividends again, but it never was my thought if it ever reached that stage to ever take all those dividends on that.  It was my thought that we were working this out, Mrs. Phillips and I together. I think that was the supposition of everyone concerned, that we would always have a living out of that place."

The quoted testimony coming from a business-wise confidential agent is rather remarkable.  One immediately wonders why the defendant on July 19, 1943, loaned the estate over $3,000 to redeem pledged common stock, and yet about three months later purchased the pledged preferred stock for herself for $750.  One also wonders why the possibility of redeeming the stock for the estate was not discussed.  Apparently from the very first the defendant decided to buy the stock for herself.  Such testimony hardly commends the defendant's cause to a court of equity.

Mrs. Phillips denied that the defendant ever told her she was purchasing the preferred stock for herself.  She testified that she had no recollection of cancelling the old stock certificate and signing the new one.  Be that as it may—the important point is that the defendant testified, when ques-

tioned by the court, that she didn't even think about the effect of the transaction at the time it was made. If this was so, then obviously she could not have conveyed its effect to Mrs. Phillips. Not having done so, it necessarily follows that we have a case of a confidential agent purchasing her principal's property without a full and understandable disclosure by that confidential agent to her trusting principal. The effect of explaining the importance of preferred stock with large arrearages was vitally important, especially when the liquidation of the Company's assets was under serious consideration.

The defendant's testimony with respect to her conversation with Mrs. Phillips at the time she caused Mrs. Phillips to cancel the old preferred stock certificate and issue the new one in the defendant's name is of vital importance:

"Q  When this transfer was effected on August 4, 1944, where was it done?

"A  Mrs. Phillips' apartment.

"Q  Who was present?

"A  No one but myself and Mrs. Phillips.

"Q  Will you state what happened?  Just tell the court.

"A  Well, I just took the certificates into Mrs. Phillips.  I told Mrs. Phillips I was going to have the stock transferred to my name, and I took the stock certificate in and I said, 'This is the certificate transferring that preferred stock to me.  Will you sign it?'

"And then I said, 'You will have to cancel the old certificate', which Mrs. Phillips did.

"Q  You told her at that time what the papers were that she was signing?

"A  Yes, I did.

"Q  You discussed them with her at that time?

"A  Yes.

"Q  When this new stock certificate was signed and the old stock certificate was cancelled, were you at that time presenting any other papers to her for signature?

"A  No, just that.

"Q   These are the only two papers which were presented to her at that time?

"A   The only thing I had, yes.

"Q   At that time did you have a conversation with her as to the ownership of the stock?

"A   As to the ownership of the stock?

"Q   I mean, you have said before that a conversation took place at this—

"A   I told her, of course, it was transferred to my name.

"Q   Yes, but I mean as to whose benefit you were holding it for?

"A   Well, I said—do you want me to tell just what I said to Mrs. Phillips?

"I said to Mrs. Phillips, 'This stock has no value now. I don't believe in our day it ever will have much value, but if it ever does, you can trust me to take care of you.'

"Q   And you are still willing to do that?

"A   I am.

"Q   And have been since the stock was purchased?

"A   Always. I never thought of anything else.

"Q   Did Mrs. Phillips ever discuss this stock with you again?

"A   No, I don't believe so, that I remember.

"Q   She never questioned that statement or the certificates until after she had consulted an attorney?

"A   Never. That is true."

Thus, we have a situation, according to defendant's own testimony, where she told Mrs. Phillips that the preferred stock had no value at that time, i. e., August 4, 1944. Let us accept the defendant's testimony that she told Mrs. Phillips that she was buying the preferred stock for herself. Nevertheless, the defendant, as a confidential agent, told her principal that the stock had no present value and would not have any value for a long time. Assuming, as she testified, that she was considering "value" only with respect to dividends, nevertheless, her emphasis on dividend value, whether intentional or unconscious, means that she did not convey to

Mrs. Phillips the information that the stock might be valuable for other purposes—as it most certainly was.

It may be noted that the defendant testified she made the statement to Mrs. Phillips that the stock had no value at the time she had Mrs. Phillips sign the new preferred stock certificate on August 4, 1944. It might be argued that statements made at that time were irrelevant because the purchase had been made some nine months before. However, the testimony was relied upon by defendant to show a full disclosure in aid of her position and must be considered in resolving the dispute.

Let us consider the financial status of the Company and the estate at the time the defendant purchased the stock on October 29, 1943, and at the time the new certificate was signed on August 4, 1944—keeping in mind that the defendant was, as a practical matter, in exclusive control of both.

The affairs of the Company were improving all the time during the period commencing at least prior to June of 1943 and extending up to the time suit was instituted. The Company's preferred stock, based on its possible liquidating value, was worth on October 29, 1943, many times more than the approximate $2.00 a share which the defendant paid for it. This is not mere conjecture because we have evidence that in June of 1943 the Company received a good faith offer of $160,000 to purchase its properties. When the defendant purchased the preferred stock in October 1943, the Company's total liabilities were about $140,000. Based on the earlier offer and allowing for a real estate commission, this meant that the outstanding preferred stock (455 shares) had a liquidating value in October 1943 of about $13,000. Thus, the 355 preferred shares purchased by the defendant had a then liquidating value of about $10,000. It is evident from the foregoing that the estate, and ultimately Mrs. Phillips and her children, would have been benefited materially at that time had they purchased the stock for $750. The existence of substantial estate obligations does not alter the

situation. Mrs. Phillips and her children should have been given a conscious opportunity to accept that risk. Indeed, in view of the then known progress of the Company, it was far from an extreme risk.

The defendant's position is rendered even more untenable when we realize that by August 4, 1944—when the certificates were signed by Mrs. Phillips—the Company's obligations amounted to about $114,000. Thus, based on the earlier offer the 355 shares of preferred stock purchased by the defendant had a then liquidating value of about $30,000. Indeed, by this time the offer exceeded all Company and estate obligations. Moreover, real estate values were admittedly on the increase during the period following the $160,-000 offer. It is difficult to believe that the defendant was unaware of the significance of this factor since she kept the records and she testified that she vigorously opposed the acceptance of the offer of $160,000 in June of 1943 because it would not have paid all Company and estate obligations and its acceptance would have deprived her of a livelihood and would have deprived her and Mrs. Phillips of a home. My conclusion is supported by the defendant's long business experience and her admitted awareness of the difference between preferred and common stock. The importance of the dividend arrearages on the preferred stock could not have escaped her attention.

Accepting the defendant's explanation that when she told Mrs. Phillips the preferred stock had no value she meant for dividend purposes, nevertheless, we have a failure of a confidential agent to provide her trusting principal with facts sufficient to give that principal a full understanding of all pertinent aspects of the transaction. In such a situation the principal is entitled at her election to have the subject matter of such a transaction impressed with a trust for her benefit.

This case exemplifies the not unusual situation where a person is brought into a difficult business situation and

thereafter works long and hard over a great many years until a remarkable job of remedying that situation has been accomplished. When he beholds all that has been accomplished through his efforts, he feels entitled to a greater reward. So realizing, he attempts to exploit a situation for his personal gain even though he thereby violates his duty as a confidential agent. The defendant's attitude in this respect was demonstrated when she testified that "if it hadn't been for me the Phillips family would have been out of there long ago, and I think I am certainly entitled to something after saving this company." It is obvious from this language that the defendant, having almost single-handedly saved the Company and thereby benefited the estate, felt that her salary and rent-free apartment over the years were not sufficient compensation, and that, therefore, she was perfectly within her rights in purchasing the preferred stock for herself. The confidential relationship doctrine operates to demolish such rationalization. The concession that she purchased it with an intent to look after Mrs. Phillips cannot justify this patent breach of her fiduciary duty to Mrs. Phillips and her children.

The court will impress a trust on the 355 shares of preferred stock for the benefit of the estate. However, certain equities in favor of the defendant must be recognized. Not only is she entitled to be reimbursed with interest for the $750 she paid for the stock, but I feel that she has a claim against the estate for her excellent job in negotiating settlement of the various claims. The money she advanced for this purpose is already secured, but she is entitled to payment for her services to the estate. The evidence shows that the defendant negotiated the settlement of estate bills aggregating about $32,000 for about $5,000. She used her own money to make these settlements. She also, in effect, settled the estate liability at the Salisbury National Bank for $750, although the principal obligation was about $11,000.

I feel that the defendant is entitled to be compensated

for her services to the estate because they were not fairly encompassed within her paid services to the Company. It seems to me from the evidence that $5,000 would be fair compensation. If the parties cannot agree, the court will determine how the defendant's interests with respect to the $5,000 and the $750 with interest, will be secured.

An order accordingly will be advised on notice.