**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

DAVID HUME, IV
MAGISTRATE IN CHANCERY

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Report:  February 27, 2026
Date Submitted:  January 15, 2026

John S. Whitelaw, Esquire
100 W. 10th St., Suite 801
Wilmington, Delaware 19801
*Attorney for Plaintiff*

Dean A. Campbell, Esquire
703 Chestnut St.
Milton, Delaware 19968
*Attorney for Defendants Wengert and Heimbach*

Richard Berl, Esquire
309 Rehoboth Avenue
Rehoboth Beach, Delaware 19971
*Attorney for Defendant Wilson*

RE:   *Larry Stercula v. Violet Wengert, Bruce Heimbach and Jay K. Wilson*
C.A. No. 2022-0667

Dear Counsel:

This is the Court's decision on Plaintiff Larry Stercula's action to recover real estate,

establish a constructive trust, and related relief.

## I. BACKGROUND[1]

---

[1] The facts set forth herein were proven by a preponderance of the evidence at trial. Factual citations are to: the Pre-Trial Stipulation and Order, D.I. 76 ("PTO"); the Draft Trial Transcript ("Tr._"); Individual Trial Exhibits (cited by party name and exhibit number) and Joint Trial Exhibits (cited by "JX" number).  Additional citations are to Plaintiff's Post-Trial Opening Brief (POB), Defendants Wengert's and Heimbach's Post-Trial Opening Brief (DOB-Wengert), Defendant Jay Wilson's Post-Trial Opening Brief (DOB-Wilson), Plaintiff's Post-Trial Reply Brief (PRB), Defendants Wengert's and Heimbach's Post-Trial

Larry Stercula seeks return of real estate located at 12 Holly Leaf Drive, Georgetown, Delaware ("the Property"), claiming that it was transferred via forged deed.[2] He contends that his former paramour, Defendant Violet Wengert, conspired with Defendant Bruce Heimbach to forge Stercula's name on the deed when it was transferred to Wengert in 2016. Stercula asserts that Wengert sold it to Defendant Jay Wilson, an innocent purchaser, in 2019. He requests that proceeds from the sale be placed in a constructive trust. Stercula contends that the sale to Wilson is void *ab initio* because of the alleged deed forgery. Because I find that Plaintiff has not proven that the deed was forged, I rule in favor of Defendants.

## A.    Stercula and Wengert Meet in Pennsylvania

Stercula lived in a home in Pottstown, Pennsylvania with his wife.[3] Wengert was a friend of Stercula's wife.[4] Wengert and her two daughters moved in with Stercula and his wife.[5] Stercula encountered challenges in his marriage, and he and

---

Reply Brief (DRB-Wengert), and Defendant Wilson's Post-Trial Reply Brief (DRB-Wilson).

[2] Petition for Recovery of Real Estate Due to Forgery, For Constructive Trust, and for Related Relief ("Pet."). D.I. 1.

[3] Tr. 6.

[4] *Id.* 6:24.

[5] *Id.* 7:4–9.

his wife separated.[6]   After his wife moved out, Stercula and Wengert became a couple.[7]

### B.    Stercula and Wengert Purchase 12 Holly Leaf Drive

Stercula visited Delaware to fish for decades.[8]  He decided it would be easier to sell his home in Pennsylvania and move to Delaware rather than traveling on weekends.[9]  In 2006, he purchased the property at 12 Holly Leaf Drive.[10]  Stercula made a $40,000 down payment and had a $100,000 mortgage.[11]  Stercula included Wengert's name on the deed and the mortgage.[12]  The mortgage included a balloon payment, so it would have to be refinanced within seven years to avoid the payment.[13]   Stercula and Wengert split the mortgage payments and living expenses.[14]

---

[6] *Id.* 8-9.

[7] *Id.* 9:17–19.

[8] *Id.* 10.

[9] *Id.*

[10] *Id.* 9–10.

[11] *Id.* 11.

[12] *Id.* 12; JX 1–2.

[13] *Id.* 13.

[14] *Id.* 12.

### C. Stercula Goes to Prison in 2010

Police arrested Stercula in 2010.[15] He left his wallet and identifying documents at the Property.[16] Stercula was convicted and sentenced to prison.[17] While incarcerated, Stercula signed a Power of Attorney (POA) allowing Wengert to refinance the Property.[18] Wengert refinanced the Property with a $90,000 mortgage in 2013, signing the paperwork both personally and as Stercula's agent pursuant to the POA.[19] The promissory note for the refinancing lists Wengert's name as the sole borrower.[20] Wengert also spoke to Stercula about removing his name from the deed to prevent them from losing the house if his victim's family sued him.[21] Wengert never visited Stercula in prison.[22] After Stercula's

---

[15] *Id.* 15.

[16] *Id.* 16.

[17] *Id.* 16.

[18] *Id.* 18–19.

[19] JX 3.

[20] Wengert Ex. 2.

[21] Tr. 19.

[22] *Id.* 17.

incarceration, Wengert her allegations that he previously sexually abused her daughters.[23]  He was released from incarceration in 2016.[24]

### D. Stercula is Released from Prison in 2016 and 12 Holly Drive is Conveyed from Stercula and Wengert to Wengert

Upon release from prison, Stercula went to a motel in Seaford, Delaware.[25] Defendant Bruce Heimbach[26] visited him at the motel.[27]  A deed dated March 14, 2016 transferred the Property from Stercula and Wengert to Wengert alone.[28]  The document bears the purported signature of Stercula, as well as Defendant Bruce Heimbach as a witness.[29]

### E. Stercula Never Returns to 12 Holly Leaf Drive.

Stercula never returned to the Property.[30]  Stercula moved from the Seaford motel to two locations in Dover, Delaware, including the Dover Interfaith Mission.[31]

---

[23] Tr. 155.

[24] *Id.* 16.

[25] *Id.* 21.

[26] Heimbach was Wengert's daughter's boyfriend.  *Id.* 29.

[27] *Id.* 21–22.

[28] JX 4.

[29] *Id.*

[30] Tr. 15:23-24.

[31] *Id.* 26, 44.

In May 2018, Stercula was re-arrested and returned to prison.[32]  He was released again in 2021.[33]

### F.    Wengert Sells 12 Holly Leaf Drive to Wilson in 2019

Wengert sold 12 Holly Leaf Drive to Wilson on June 19, 2019 for $105,000.[34] Wilson was a bona fide purchaser without notice.[35]   Stercula received no money from the sale.[36] Stercula learned about the sale from his sister while he was incarcerated in 2019.[37]

## II.    ANALYSIS

I begin with the initial question presented by both sides:  can Stercula prove by clear and convincing evidence that his signature on the 2016 deed was forged? This question must be answered in Plaintiff's favor before I can consider the parties' other arguments.  As with a jury, when there is contradictory testimony, I should

---

[32] *Id.* 27.

[33] *Id.* 43–44.

[34] JX 11, 13.

[35] PTO § II(I).

[36] *Id.* § II(B).

[37] Tr. 44.

make best efforts to make one harmonious story of it all. *Mullin v. Ascetta*, 2021 WL 4272063, at *2 (Del. Super. Sept. 20, 2021).

### A. Wengert's and Heimbach's accounts of the deed transfer are more reliable than Stercula's.

### 1. Stercula's testimony

The POA specifically granted Wengert the ability to execute documents related to the sale and transfer of 12 Holly Leaf Drive.[38] Stercula testified that his goal when he bought the house was to live there for the rest of his life.[39] He decided not to go back to the house because it could "start trouble."[40]

I found Stercula to be a fairly credible witness but significantly limited in his ability to recall. Stercula suffered three strokes in 2022 resulting in memory issues.[41] Stercula also admitted to being diagnosed with a form of dementia while incarcerated from 2010 to 2016.[42] In 2019, Stercula wrote in a Superior Court filing

---

[38] JX 15.

[39] Tr. 25–26.

[40] *Id.* 24:10-13.

[41] *Id.* 49:18-23.

[42] *Id.* 57.

that he was "medically, mentally disabled."[43] Stercula takes medication for his memory.[44]

Stercula denied that he was concerned about losing the house to his victim's family because Wengert's name was on the deed.[45] Despite reading the POA before signing it, Stercula believed that it was limited and did not permit Wengert to sell the house.[46] This is wrong. The POA specifically contemplates sale and transfer of the Property.[47] The POA states that Stercula makes Wengert his "true and lawful Attorney-in-fact with the power and authority to act on [his] behalf, with respect to the sale of the property known as 12 Holly Leaf Drive . . . ."[48] Stercula believed that the document presented in Court was missing a portion.[49] Stercula had difficulty remembering the POA that he signed.[50] He testified, "I do regret it, you know, if

---

[43] Wengert Ex. 1.

[44] Tr. 56.

[45] *Id.* 19.

[46] *Id.* 36–38.

[47] JX 15.

[48] *Id.*

[49] Tr. 38–39.

[50] *Id.* 36–40.

this is all true," referring to the Power of Attorney submitted during the trial.[51]  This was indicative of Stercula's failed memory.

I look to the surrounding facts to make sense of his testimony.  When he was arrested, Stercula left everything he owned at the Property, including his identification and wallet.[52]  Stercula made no efforts to return to the house or have anyone removed from it.[53]  If Stercula did not intend to transfer the house to Wengert and, instead, intended to retain the home himself, his actions are incongruous with this alleged intent.  After his release from prison, he did not return to the house even though his wallet and other identification were there.  Nor is there any indication that he tried to pay the mortgage or inquired into how it was being paid.  He lived in a motel and several locations in Dover including the Dover Interfaith Mission.[54]  Although Stercula expressed discomfort with returning to the home in light of abuse allegations involving Wengert's daughters, he still fails to adequately explain his abandonment of the property and failure to act as if he still owned the home.  After all, Stercula was essentially homeless after his release.  Despite his claim at trial that,

---

[51] *Id.* 40:1–2.

[52] *Id.* 16.

[53] *Id.* 42.

[54] *Id.* 44.

"I want my house back so I can die there,"[55] he took no steps to return to the property or to withdraw his financial interest from it. It defies logic that he would act this way if he believed he would one day again live in the house. The fact that he did not have in-person or telephone contact with Wengert since his time in prison is also indicative of a decision to move on from the property.[56]

### 2. Wengert's testimony

Wengert has bias against Stercula because he allegedly abused her daughters. Even so, she maintained contact with him for a time after he went to prison, including putting money on his prison commissary account.[57] I found Wengert's testimony to be credible. She was unaware that the POA allowed her to sell the property.[58] This is important because Wengert did not need to conspire to sell the property. Stercula's POA gave her the ability to sell the property at any time without his input. If Wengert intended to steal the Property from Stercula, she already possessed legal

---

[55] *Id.* 30.

[56] *Id.* 41.

[57] *Id.* 153–54.

[58] *Id.* 141.

power to obtain sole title to the property via the POA. The fact that she involved Stercula in the 2016 deed buttresses her argument that Stercula agreed to have her assume responsibility for the mortgage and the property. Her collaboration with Stercula after executing the 2012 POA further indicates no intent to illicitly deprive Stercula of lawful title.

Wengert learned via an application on her phone that Stercula was being released from prison in 2016.[59] Although there was no agreement to do so, Wengert had the 2016 deed drawn up to remove Stercula's name because she was paying the mortgage.[60] She was hoping he would sign the house over to her.[61] Wengert made the mortgage payments on the property from 2016 to 2019.[62] The attorney who drafted the 2016 deed instructed Wengert that Stercula would have to sign off on the deed.[63] Heimbach acted as a go-between to get the deed signed.

### 3. Heimbach's testimony

---

[59] *Id.* 140.

[60] *Id.* 138, 148, 161.

[61] *Id.* 148.

[62] *Id.* 141–42.

[63] *Id.* 161.

Heimbach met Stercula at the motel in Seaford after his release.[64]  Heimbach

provided Stercula with a check from Wengert and drove him to a bank where

Stercula deposited the check.[65]  The parties diverge on what happened next.  Stercula

testified that they returned to the hotel after the bank visit and Heimbach left.[66]

Heimbach says that after they returned, they discussed the drafted deed and Stercula

agreed to sign in order to avoid losing the home if they were sued.[67]  Heimbach

drove Stercula to the UPS store in Seaford where they both signed the deed and it

was notarized.[68]  Even considering Heimbach's potential for bias based on his

relationship with Wengert's daughter, I found his testimony credible.

A discrepancy present in the transaction is that the deed was signed and

notarized on March 14.[69]  The redemption check that Stercula deposited is dated

March 14, 2016, but the reverse side of the check appears to contain a deposit

date/time of March 17, 2016.[70]  Stercula argues that this discredits Heimbach's

---

[64] *Id.* 174.

[65] *Id.*

[66] *Id.* 23.

[67] *Id.* 174.

[68] *Id.* 175–76.

[69] JX 4.

[70] JX 7, Exemplar K-11.

testimony because Heimbach testified that both the bank and UPS store visits occurred the same day.[71] Defendants contend that Heimbach may have misremembered the chain of events because they occurred almost 10 years ago.[72] I note that the redemption check was not submitted as an independent exhibit. Rather, it was part of the package of handwriting exemplars reviewed by Plaintiff's handwriting expert. No bank official testified about reasons for the difference between the date on the front of the check, the alleged deposit date, and the date on the back. Both Stercula and Heimbach have bias to testify as they did. Stercula wanted his property back and Heimbach was aligned with Wengert. On balance, I give more weight to Heimbach's testimony because his recall at trial was superior to Stercula's.

### B. The Handwriting Opinions

Both parties provided handwriting experts—Katherine Koppenhaver for the Plaintiff and David Sexton for the Defendants. I find neither particularly helpful in determining the authenticity of Stercula's signature on the 2016 deed. The experts produced reports that were introduced at trial.[73]

---

[71] POB 7–8.

[72] DRB 2.

[73] JX 6, 8.

Koppenhaver opined that the signature on the 2016 deed[74] was not Stercula's. Koppenhaver was cross-examined about an article she authored for the 2015 International Association of Document Examiners Journal where she explained recommendations for proper handwriting analysis.[75] First, the examiner should obtain sufficient information about the subject to enable the examiner to draw conclusions.[76] She admitted to neither meeting nor interviewing Stercula about his signature or the 2016 deed and knew nothing about him.[77] Second, her article recommended that an examiner have 20 to 25 reference signatures for comparison.[78] Koppenhaver had 11 reference signatures in this case. Third, she wrote that the compared documents should be similar in nature.[79] She admitted that the documents in this case varied, including signatures on checks, court documents, and financial documents.[80] Fourth, she wrote that the examiner should request original exemplars

---

[74] JX 4.

[75] Ms. Koppenhaver founded the International Association of Document Examiners. Tr. 89-90.

[76] *Id.* 98–99.

[77] *Id.*

[78] *Id.* 99.

[79] *Id.* 101.

[80] *Id.*

for comparison.[81]  She requested originals but none were provided.[82]  Her article

reflects that photocopies may be used, but when using photocopies a "conditional

opinion" should be given.[83]  When asked about this at trial, she had the following

exchange:

> Q:  And so is this report of yours conditional?
> A:  It's highly probable that the signature is not genuine.
> Q:  That's not what I asked.  I asked if this report of yours is conditional or not.
> A:  Basically, in my mind it is, yes.
> Q:  So your testimony here today is conditional as well?
> A:  No.  It is my professional opinion based upon the writing that I had for comparison purposes.[84]

I give Koppenhaver's opinion little weight.  By her own standards she

possessed limited ability to make a finding of authenticity.  She lacks the requisite

number and type of exemplars.  None of the exemplars examined are original

documents.  As she wrote in her article, use of photocopied exemplars requires a

conditional opinion.  Yet she marched forward to an unconditional finding,

admitting that her report was conditional "in my mind" but that her testimony was

---

[81] *Id.* 101–02.

[82] *Id.*

[83] *Id.* 102.

[84] *Id.* 102:8–19.

not conditional.  It is illogical to derive an unconditional opinion from a conditional report.

David Sexton, like Koppenhaver, testified that 20 to 25 handwriting exemplars in the chronological period around the questioned signature were needed.[85]  He noted that only three or four exemplars were submitted around the 2016 time frame.  Based on the lack of exemplars, Sexton found that it was "impossible" to determine whether the questioned signature was authentic or a forgery.[86]  Sexton concluded that if he made a finding under the circumstances, "they would run me out of town if I did this in the forensic document examination in the community and made an identification based on three or four exemplars compared to a sample signature."[87]  Where both experts coalesce is that they examined fewer than an ideal number of exemplars necessary to render an opinion on the authenticity of Stercula's signature on the 2016 deed.  Neither expert's opinion was helpful in determining authenticity.

### C. The Notary Public Confirmed that She Notarized the Signatures and Followed Standard Procedures

---

[85] *Id.* 212, 220.

[86] *Id.* 221, 228; JX 8.

[87] Tr. 221:14-17.

Laura Rogers was employed at the Seaford UPS store in 2016.[88] She was a notary public concurrent with her employment in 2016.[89] Although there were no notarial recordkeeping requirements at the time, Rogers maintained her own procedures.[90] Those procedures required that all signers show identification and that all signatures occur before her.[91] She made no exceptions.[92] She compared each ID to the signer standing before her.[93] If a document was pre-signed, she required the customer to retrieve a clean copy before she would notarize it.[94] She was not familiar with Stercula or Heimbach before their appearance in the UPS store.[95] She confirmed that the notarial signature on the 2016 deed was hers.[96]

### D. The Notarial Presumption

In *Krapf v. Krapf*, this Court adhered to the notarial presumption:

---

[88] *Id.* 190.

[89] *Id.* 191.

[90] *Id.* 191–92.

[91] *Id.*

[92] *Id.* 193; *see* D.R.E. 406 ("Evidence of a person's habit . . . may be admitted to prove that on a particular occasion the person . . . acted in accordance with the habit or routine practice.").

[93] Tr. 200.

[94] *Id.* 193.

[95] *Id.* 198.

[96] *Id.* 194; JX 4. Plaintiff's Post-Trial Opening Brief also conceded that Rogers "undisputedly notarized" the 2016 deed. POB at 7.

> An acknowledgment of a signature by a notary gives rise to a presumption of the genuineness of that signature. This presumption flows from a notary public's duty, in making an acknowledgment, to determine that the person who signs the document is the person whose signature appears on the document.

2015 WL 230457 at *4 (Del Ch. Jan. 16, 2015) (citation omitted). I have found the testimony of Wengert and Heimbach more credible and of greater value than Stercula's. Rogers followed her procedures, obtained identification from Heimbach and Stercula, compared that identification to the people standing before her, and watched them sign the 2016 deed. The signatures on the deed, including Stercula's, are presumed to be authentic. I do not find that Stercula has proven by clear and convincing evidence that his signature was forged to overcome the notarial presumption. *Bradford v. Vinton*, 153 A. 678, 682 (Del. Ch. 1930).

Based on my trial assessment of the parties' credibility and ability to recall, I have found the Defendants' testimony more reliable. Even if I discount the parties' contradictory testimony and the lack of reliable expert handwriting opinions on Stercula's signature authenticity, the notarial presumption carries the day. The signatures are presumed to be genuine. Plaintiff has failed to prove by clear and convincing evidence that his signature was a forgery.

## III. CONCLUSION

For the reasons explained above, I rule in favor of the Defendants. Having ruled in Defendants' favor, I find no bad faith or fraud on their part and do not award Plaintiff attorneys' fees. Plaintiff shall be responsible for all costs. This is a final report under Court of Chancery Rule 144.

Sincerely,

*/s/ David Hume, IV*

David Hume, IV
Magistrate in Chancery

cc:    All counsel of record (by File & ServeXpress)