HELEN ROGERS BRADFORD,

*vs.*

BENJAMIN VINTON.

*New Castle, Dec.* 12, 1930.

*Aaron Finger*, of the firm of Richards, Layton & Finger, for complainant.

*James R. Morford*, of the firm of Marvel, Morford, Ward & Logan, for defendant.

THE CHANCELLOR. The solicitor for the complainant states on his brief that the complainant's claim to have the deeds set aside, is based on two grounds—one, upon the presumption of fraud, or constructive fraud, arising out of the relations between the parties; and two, upon actual fraud in procuring the execution of the deeds in question, by which the property was conveyed

absolutely to the defendant instead of to the St. Georges Trust Company, of which the defendant was treasurer, in trust for the complainant.

Upon the question of constructive fraud, the complainant cites the case of *Downs, et al., v. Rickards, et al.,* 4 *Del. Ch.* 416, in support of the proposition that a trustee is prohibited absolutely from purchasing the property entrusted to his care. That case does so hold. See also, *Van Dyke, et al., v. Johns,* 1 *Del. Ch.* 93, 12 *Am. Dec.* 76; *Eberhardt, et al., v. Christiana Window Glass Co., et al.,* 9 *Del. Ch.* 284, 81 *A.* 774; *In re Wheeler's Estate,* 11 *Del. Ch.* 469, 101 *A.* 865; *Wilmington Trust Co. v. Carrow,* 14 *Del. Ch.* 290, 125 *A.* 350. This principle is not applicable in the instant case however, because, even if the defendant be regarded as synonymous with the St. Georges Trust Company of which he was the active officer, yet the property which he purchased was not entrusted to either his or its care and confidence. It was the subject-matter of a trust in the control of another and distinct trustee, viz., the Delaware Trust Company. There was therefore no relation of trusteeship between the defendant and complainant of such character as would, on the authority of the above cited cases, absolutely prohibit the sale.

The complainant insists that because of the fact that the defendant was an officer of St. Georges Trust Company which was a trustee for her to hold two properties other than "Stockton" and because also she conferred often with the defendant upon her business affairs and looked to him for advice and guidance, she reposed trust and confidence in the defendant, and that consequently the defendant stood towards her in a fiduciary relationship. Granting this relationship to have existed, though I have very serious doubts that it existed to the degree contended for by the complainant—yet granting that it existed, it does not necessarily follow that the defendant was thereby rendered incapable of entering with the complainant into a transaction of purchase and sale. I have been cited to no case which would so hold. The case of *McKnatt, et al., v. McKnatt,* 10 *Del. Ch.* 392, 93 *A.* 367, cited by the complainant, does not so hold. Where a fiduciary relationship is shown whereby one party is in an attitude of dependence upon, or responsive to the control and

advice of, another, and the validity of a transaction between the parties is in question, the extent of the significance which the court attaches to the status of the fiduciary relationship is, that the transaction should be subjected to careful scrutiny with the view of determining whether the person in whom the confidence was reposed or in whom a controlling influence rested, used his position to advantage himself. An inquiry of this sort takes the form of examining into the fairness of the terms of the transaction. It was so in *McKnatt, et al., v. McKnatt, supra*, as also in *Billage v. Southee*, 9 *Hare*, 534; *Storrs v. Scougale*, 48 *Mich.* 387, 12 *N. W.* 502, 508; *Kyle v. Perdue*, 95 *Ala.* 579, 10 *So.* 103; all of which are cited by the complainant. In such cases there is no prohibition against mutual dealings such as the policy of the law imposes upon those who stand in the formal relationships of trustees, guardians, etc.

There being no such formal relationship in the instant case, there was nothing to forbid the defendant from making the purchase which the bill seeks to avoid. Assuming, however, that the relations between the complainant and defendant were such as to invoke the rule that the transaction should be carefully scrutinized and its terms even strictly examined for their fairness, such scrutiny and examination will leave the defendant entirely acquitted of obtaining an unfair bargain. The fact of the matter is that the Delaware Trust Company, which was the trustee for this particular property, was interposed between the complainant and defendant, and was itself entirely satisfied that the consideration of $10,400.00 represented the fair value of the property. Furthermore, no contention is raised by the complainant against the fairness of the price. Indeed, it is conceded that the defendant paid a price that was a fair one. So far then as the element of fairness of price is concerned, there is no occasion to examine further into the facts.

The real, and as it appears to me the only, question in the case is therefore whether or not the complainant was induced to execute the deeds by actual fraud, in that her signatures thereto were fraudulently obtained by deceiving her as to their contents. This is a question of fact. It may be conceded that the degree of confidence and trust which a grantor reposes in a grantee may

be so great as to prompt the court carefully to scrutinize the facts where it is claimed that the grantor's signature was obtained by the inducements of the grantee's false representations as to the deed's contents. That there was that degree of confidence and trust in the defendant which the complainant claims she reposed in him, or that she was dependent upon him for guidance to the extent she claims, I am bound to say I have my serious doubts. The complainant, while not a young woman, is by no means one whose faculties have been dulled by age or whose mental alertness is on the wane. On the witness stand, she gave the distinct impression of a person of physical vigor and mental acumen. If she placed herself confidingly under the control of the defendant's suggestions, it could not have been by reason of any feeling of necessary dependence upon him or by reason of any impairment of her own faculties or by reason of any weakening of her own powers of volition. The case therefore is not one where a person in an inferior position of weakness has come under the dominating influence of another.

That the complainant consulted with the defendant concerning her affairs and sought his advice is apparent. The occasion for this was certain financial problems with which the complainant was troubled. At and shortly before the time when the deeds were executed, the complainant was in need of money. A demand was being made upon her for something over $14,000.00 by the estate of her brother-in-law, William duPont, on account of taxes which he had paid for her during his life time; she owed $10,000.00 to a pawn broker with whom she had pledged her jewelry; she owed the following further sums—$40,000.00 to the Delaware Trust Company on a note secured by collateral; $4,000.-00 to the Farmers' Bank, payment of which had been demanded; $7500.00 on a first mortgage; and $4500.00 on a second mortgage upon "Stockton" and $500.00 on a judgment against her. These with other obligations made the complainant's indebtedness in the neighborhood of $116,000.00. $38,000.00 of this amount may be disregarded however for the purpose of estimating the exigent pressure of the complainant's obligations, for the reason that it was owed to a trust of which the complainant was the sole beneficiary.

The complainant's annual interest burden which she was required to meet out of her income was about $4700.00. Her annual income ranged from $13,000.00 to $16,000.00, derived in large part from trusts in her favor. That the demands upon her for interest, and the demands made upon her for the payment of the taxes advanced by Mr. duPont on her account, as well also the demand by the Farmers' Bank for payment of its loan of $4,000.00, presented a troublesome financial situation which annoyed the complainant very considerably, seems to be clearly deducible from the testimony. The complainant's resort to pawn brokers for loans at high rates of interest (she appears to have negotiated a pawn-broker loan other than the one above referred to and declined to say whether she had given a bonus of $2500.00 in connection with that loan), and her giving of a bill of sale of all her personal property just a few weeks before the deeds were executed with the motive of circumventing the apprehended action of creditors against her,—indicate that the complainant was being harassed by the financial demands upon her notwithstanding the comfortable income she was receiving.

The defendant contends that it was the stress of the complainant's immediate financial problems that led to the business relations which he had with her. He states that the complainant turned to him, the active officer of the St. Georges Trust Company which was already trustee for two properties in which the complainant had the beneficial interest, with the request that he endeavor to straighten out her pressing business troubles. The thoroughness with which he went into her affairs, the intimate knowledge he obtained from the complainant of her entire assets and liabilities and the activities he exhibited in devising plans for her relief, are hard to explain except upon the theory that he was undertaking, as he says, to assist the complainant in the working out of her financial perplexities. It was apparent, he says, that the complainant would have to effect a sale of some property and he so advised her. Thus, he says, it came about that the matter of the sale of "Stockton" was decided upon. Having tried to interest others in the purchase of "Stockton" and failed, the defendant claims that the complainant suggested to him that he purchase it. He at first declined to consider the

suggestion on the ground that he was not financially able to make the purchase and lay out the expenditures absolutely necessary to put it in condition, and also because the acreage of "Stockton" was too small to make it pay. On reflection he concluded that if he could get "Stockton" at a fair price, he would make the purchase provided he could sell his home in Delaware City and purchase about one hundred acres of land lying across the road from "Stockton" so as to give him a farm of desirable size. In case he could do these things he decided that he would purchase "Stockton" as requested by the complainant, and take up his residence there. Thereupon he negotiated upon the price with the Delaware Trust Company, Trustee for "Stockton," found that the trustee would accept $10,400.00 which he regarded as fair, and then proceeded to arrange a sale of his Delaware City home and to satisfy himself that he could secure the additional hundred acres across the road. (Which he afterwards secured.) After thus completing his arrangements, he proceeded to purchase "Stockton" for $10,400.00, receiving the two deeds therefor which the pending bill seeks to set aside. No significance is to be attached to the fact that the Delaware Trust Company agreed upon the sale at $10,400 prior to its appointment as trustee, as a circumstance of a suspicious nature indicating a design against the defendant. This is for the reason that the defendant was confronted with the necessity, from his point of view, of arranging several co-temporaneous transactions, and it was manifest that if the principal transaction, viz., the purchase of "Stockton" was not assured to him, it was folly for him to negotiate the ancillary ones. And so he sought a definite committal from the Delaware Trust Company, which was expected to become the trustee, in advance of its formal appointment. Moreover, the Delaware Trust Company engaged to make the sale, in case of its anticipated appointment as trustee, only in the event that the complainant expressed her approval and consent in accordance with the provisions of the trust.

The complainant denies that she ever asked the defendant to purchase "Stockton," or that she ever knowingly consented to the sale. She insists that it was against her principles to sell any real estate, and I think that as a general proposition the com-

plainant's aversion to the sale of anything was strong, so strong as to amount almost to an idiosyncracy. But it is entirely conceivable that circumstances may arise of so over-powering a nature as to outweigh such a strong aversion against aliening real estate as even the complainant may be conceded to have possessed.

On November 27, 1928, the two deeds in question were executed by the complainant. She admits the genuineness of her signature to each of them. She has a distinct recollection of the circumstances attending the execution of the deed before Judge Rice. But, while admitting her signature to the deed in which she joined with the Delaware Trust Company, she denies all recollection of ever signing it. The defendant testified that she signed and acknowledged this deed in the offices of the Delaware Trust Company on the morning of the twenty-seventh of November, and that immediately she, in his company, went to the office of Judge Rice for the purpose of having the companion deed executed before him. The complainant denies that she ever signed any deed in the offices of the Delaware Trust Company. The notary who purports to have taken her acknowledgment to the deed was J. Duncan Reilly. He was a regular employee of the Delaware Trust Company. He is now dead. Mrs. Bradford denies that she ever saw J. Duncan Reilly and specifically denies ever having executed any sort of paper before him. If, therefore, her testimony be true, the certificate of the deceased notary is false. Similarly false would be the representation of his signature as a witness that the complainant had signed, sealed and delivered the deed in his presence. It is unfortunate that death has removed Mr. Reilly as a witness. The veracity of the deceased notary's certificate, however, is aided by a presumption in its favor. So strong is this presumption that it has been held that an acknowledgment taken before an officer who is under oath cannot be impeached except by evidence that is clear and convincing beyond a reasonable doubt. *Gritten v. Dickerson*, 202 *Ill.* 372, 66 *N. E.* 1090.

The substance of the complainant's testimony is that while the signature to the deeds is hers, yet she never knew that the deeds assumed to convey any real estate, especially "Stockton,"

to which she was particularly attached. I have just adverted to the contentions of fact respecting the joint deed executed by the complainant and the Delaware Trust Company and pointed out the fact that as to that deed, the acknowledgment which she disputes is supported by a legal presumption in its favor.

As to the other deed, what we may call the companion deed, executed and acknowledged by the complainant alone before Judge Rice, there is no dispute concerning the facts. The complainant admits that she signed and acknowledged that deed. She denies however that she knew its contents. She says she thought she was executing some paper which was necessary to transfer the trust for "Stockton" out of the Delaware Trust Company, where she says she had never desired it to be, to the St. Georges Trust Company, where the trust for two other farms was vested. She therefore knew that the paper she was executing dealt with "Stockton." Judge Rice testified in the cause and stated that, after satisfying himself upon certain essential facts, he took the deed and asked the complainant if she understood the nature of it, that she replied that she did, and that thereupon she executed it and he took the acknowledgment. Judge Rice in keeping with his well-known habits of meticulous care, I have no doubt, was even more specific in his inquiries than his own general statement would leave one to infer. Indeed the complainant herself states the precision of Judge Rice's inquiries of her, for she testified that Judge Rice asked her if she understood that she was transferring her property to Mr. Vinton, to which she replied, "Yes." The complainant now explains away that destructive reply by saying that she thought of Mr. Vinton as synonymous with the St. Georges Trust Company, of which he was the active officer, and that what she meant was that she knew she was transferring the property to the St. Georges Trust Company which would be the trustee for it. Why the complainant, however, should have thought that it was necessary for her to go through the formality of executing a deed under the provisions of the act governing the conveyance of property by a married woman who has been abandoned by her husband, in order merely to effect a change of trustee for one of her properties, it is difficult for me to understand; especially when it is considered that the

complainant had had previous experience in the matter of securing a new trustee for her property, and knew, if she remembered, that a deed from her was not a requisite step in the procedure.

Not only is the complainant, with respect to the joint deed executed by her with the Delaware Trust Company confronted by the adverse presumption against her, and, with respect to her separate deed, by the damaging nature of the facts just pointed out that attended its execution, but she is as well confronted by subsequent occurrences which weigh strongly against her contention that she never knew she had signed deeds that effected a sale of "Stockton."

I refer to the disposition of the proceeds—the $10,400 of consideration money paid by the complainant. A settlement sheet showing the application of the proceeds was prepared by the Delaware Trust Company and sent to the complainant. It showed a cash balance, after the first mortgage and certain other charges, due the complainant of $1557.78 for which a check dated December 3, 1928, was delivered to her. This check was deposited the next day to her credit in the St. Georges Trust Company. An item of $325.00 was retained by the Delaware Trust Company to adjust a matter of interest. Later, on December 8th, a further settlement was made with the complainant of the retained item and a check for $314.65 delivered to her and deposited on December 10th in the same account. The papers showing these two settlements disclosed on their faces that they dealt with the proceeds of the sale of "Stockton" to the defendant, and each of the two settlement statements was signed by the complainant with an indication of her approval.

The complainant answers the damaging effects of these signed admissions by saying that she never read them and that she signed them in blind obedience to the dictations of the defendant who thrust them before her.

If the complainant never knew that "Stockton" had been sold and that she had signed acknowledgments of having received the proceeds of sale, the cash balance to her being $1872.63, the total of the two checks above referred to, one wonders where she thought that sum of money which got into her account came from. She knew she had money in that account for she checked

against it.  By December 14th in fact the account was overdrawn. She checked out of that account to meet some at least of the pressing demands upon her, the largest I believe being a demand of $1659.15 to cover interest to her pawnbroker.

The complainant, in response to the suggestion that her checking against her account shows she must have known that her ready funds had been augmented by the sale of property, replies in her testimony that she had deposited in this account the proceeds derived from the sale of property in another trust (a sale which she was powerless to prevent) amounting to $3,-063.16.  This sum was remitted by the Wilmington Trust Company, Trustee, by letter dated September 29, 1928, and the complainant's account in the St. Georges Trust Company shows the same amount to have been deposited to her credit on October 1st.  It was this money, says the complainant, that she thought she was checking out in payment of her bills and so she had no reason to think that her account had in it any money obtained for "Stockton."

This explanation, however, is not a satisfactory one.  A mere inspection of the bank statement exposes its unacceptability. The bank statement shows only three deposits—the $3,063.16 on October 1st, and then the two "Stockton" settlement amounts, viz., $1557.78 on December 4th and $314.76 on December 10th. Now, on December 4th when the first "Stockton" money was deposited, the first deposit of $3063.16 had been reduced by the complainant's drafts upon it to $419.25.  Adding this balance to the two deposits derived from the "Stockton" sale, she therefore had in bank $2291.79.  From December 4th to December 14th the complainant drew checks against her account aggregating $2398.13, which demonstrates conclusively that the complainant could not have thought that the checks she drew on and after December 4th would or could be met by the moneys received from the Wilmington Trust Company, which had shrunk to only $419.25.  Allowing to the complainant some indulgence in favor of that carelessness in keeping informed upon bank balances which some cynics are inclined to attribute to her sex, it does not seem probable that the complainant could have been so careless in this regard as to fall in error to the extent of nearly two

thousand dollars, especially when the account in question covered so short a time and had in it only three deposit credits.

The foregoing are the outstanding features of this case which a few moments of reflection point out in connection with the documentary evidence. They seem to me to weigh heavily against the complainant's contentions.

In addition to the corroborating support which the foregoing lends to the defendant's contention that the complainant had full knowledge of the fact that she was making a sale of "Stockton" to the defendant and that she willingly assented thereto, the defendant's contention is strongly aided by the testimony of Jesse L. Shepherd. Mr. Shepherd was, at the time the deeds were executed, chairman of the board of directors of the Delaware Trust Company. He apparently took personal supervision of the transaction in question. His interest in the matter is as impersonal as that of the reputable trust company for which he was acting. His testimony is explicit to the effect that the complainant conferred with him concerning her need for money, that she discussed with him the letter of the Delaware Trust Company offering to sell "Stockton" to the defendant and that she stated she wanted the defendant to have the farm, meaning "Stockton." This testimony is in flat contradiction of the critical point in the complainant's case. The complainant denies it. What possible motive however Mr. Shepherd could have for misrepresenting the facts, I am at a total loss to discover. So far as I can see, he is a witness entirely free from all personal interest, and, being so, his evidence is to be accorded great weight in the process of seeking for the preponderance of testimony between the irreconcilable positions of the parties.

The weight of the evidence favors the conclusion that the complainant's signatures to the deeds were not obtained as the result of a present representation by the defendant falsely stating their contents.

The evidence is quite replete with affirmance and denial upon several points of fact which, in comparison with the matters hereinbefore pointed out, are after all of rather minor importance. This opinion is running to too great length to warrant any detailed notice of these minor matters, especially as they cannot

have sufficient weight to be of consequence to the result which the nature of the more important features leads to.

This bill seeks to establish a constructive trust based on an alleged fraudulent procurement by the defendant of the complainant's signature to and acknowledgment of the two deeds. The burden is on the complainant to support the charge of fraud. Where it is sought to turn a deed absolute on its face to one that was in fact in trust, the party that would thus contradict the appearance of so formal and solemn an instrument, must support this burden by proof that is clear, full and satisfactory, leaving no doubt of the existence of the trust alleged. *Rentoul v. Sweeney*, 15 *Del. Ch.* 302, 137 *A.* 74; *Hall v. Livingston*, 3 *Del. Ch.* 348; *Harvey v. Pennypacker*, 4 *Del. Ch.* 445; *Pierson v. Pierson*, 5 *Del. Ch.* 11.

This is the sort of burden that rests on the complainant in a case of this sort. I do not think she has successfully borne it. Why the defendant should have sold his home, laid out money to purchase the hundred additional acres of land at a fair price to add to that which he was said to have been scheming to acquire from the complainant, incurred the necessity of expending considerable sums to improve the dilapidated condition of the property he is said to have been scheming to acquire from the complainant; why the deceased notary public should have been willing to aid the alleged machinations of the defendant by falsifying his official oath in the affixing of a spurious acknowledgment, and the chairman of the board of directors of a reputable trust company should have been willing likewise to forward the defendant's deep laid alleged scheme by swearing to a falsehood —are things I cannot understand. That the defendant should have done these things and have succeeded in drawing other absolutely disinterested persons into the operation of his alleged plot, is more difficult to understand when it is remembered that the ultimate purpose to be gained was—the purchase of a property at its admittedly fair value.

The complainant not having supported the burden of proof that rests upon her, the bill should be dismissed, with costs on the complainant.

Let a decree be submitted accordingly.