Mary Sadler LEVIN,
Plaintiff-Appellant,

v.

John Lewis SMITH, Jr.,
Defendant-Appellee,

John Ambler SADLER,
Plaintiff-Appellant,

v.

John Lewis SMITH, Jr.,
Defendant-Appellee.

Supreme Court of Delaware.

Submitted: March 12, 1985.
Decided: July 10, 1985 *.
Resubmitted: Oct. 16, 1985.
Decided: July 25, 1986 **.
Reargument Denied Sept. 5, 1986.

* The Court's prior opinion, dated July 10, 1985, is hereby withdrawn.

** This opinion is issued following supplemental briefing and reargument.

David A. Drexler (argued) and Jack B. Blumenfeld of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiffs-appellants.

Eugene H. Bayard (argued) of Wilson, Halbrook & Bayard, Georgetown, for defendants-appellees.

Before HORSEY, MOORE and WALSH, JJ.

HORSEY, Justice:

By decision dated July 10, 1985, this Court held that the Court of Chancery erred in failing to impress, for the benefit of plaintiffs, Mary Sadler Levin and John Ambler Sadler, an oral trust on a tract of land in Delaware known as Indian Beach. The land had been deeded in fee in 1946 to defendant John Lewis Smith, Jr. ("Smith, Jr.") by his father, John Lewis Smith, Sr. ("Smith, Sr."), four years before the father's death in 1950. Plaintiffs are the two children of Smith, Sr.'s daughter, Mary Ambler Sadler, Smith, Jr.'s half-sister, who died in 1977.

In this Court's original decision, the Court concluded that, "the facts, and the inferences and deductions to be drawn therefrom, admit of but one reasonable interpretation—that such oral trust was created by Smith, Sr."

Defendant moved for reargument, contending that this Court had (a) committed legal error as to plaintiffs' burden of proof; and (b) abused its standard of review by failing to give due deference to the findings of the Trial Judge, especially with respect to matters of credibility.

\* \* \* \* \* \*

We granted reargument and ordered further briefing; and a new panel of the Court heard oral argument on both the facts and the law on October 16, 1985.[1]

On the enlarged record, we again conclude that the facts, and the inferences and deductions to be drawn therefrom, admit of but one reasonable interpretation and conclusion—that an oral trust was created by Smith, Sr. and confirmed by Smith, Jr.'s conduct and dealings with his half-sister over a period of twenty-five years, and until her death in 1977. Accordingly, we must reverse the decision of the Court of Chancery and direct that an oral trust be impressed upon the land in question for the equal benefit of Smith, Sr.'s two children. However, we do so for error of law as well as fact. We now find the Court of Chancery to have also committed legal error as to plaintiffs' burden of proof of an express oral trust in land. Under the facts of this case, we find the rule in *Bodley v. Jones*, Del.Supr., 32 A.2d 436 (1943), requiring proof of an oral trust in land to "all reason-

---

1. Since one member of the original panel, Chief Justice Daniel L. Herrmann, retired, a new panel of the Court was convened to hear reargu-

ment. This Court's original Opinion dated July 10, 1985 is hereby withdrawn.

able certainty," to be inapplicable and that plaintiffs were entitled to prevail upon a finding of a simple preponderance of the evidence. Applying the correct burden of proof, we conclude that the findings and deductions of the Trial Court for refusing to impress a trust are clearly erroneous, that the "doing of justice requires their overturn [and that] we are free to make contradictory findings of fact." *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

I

The following facts are largely, if not entirely, undisputed. In the early 1930's, Smith, Sr. and three others formed the Rehoboth-Indian Beach Company (hereinafter "the Company") which acquired by foreclosure sale a large tract of ocean and bay front property, known as Indian Beach, in Lewes and Rehoboth Hundred, Delaware. By 1946, Smith, Sr. had become the sole shareholder in the Company.

In 1946, through the Company, Smith, Sr. arranged a real estate transaction which lies at the heart of the present controversy. By duly recorded deed, Smith, Sr. caused the Company to convey: (1) two lots in Indian Beach to Helen Dapray, Smith, Sr.'s sister-in-law; (2) two lots in Indian Beach to his daughter, Mary Ambler Sadler; and (3) all the residue of the Company's lands to his son, John Lewis Smith, Jr., the defendant.

The latter conveyance was cast in the form of a fee simple deed for consideration, supported by Smith, Jr.'s assumption of a corporate debt and a promissory note which he executed in favor of his father. After only three years, these obligations were satisfied through Smith, Sr.'s crediting the proceeds from land sales he arranged against his son's promissory note.

There is no evidence that Smith, Jr. made any payments on the note. Moreover, Smith, Sr. orchestrated the conveyance completely. Smith, Jr. was not asked if he wished to purchase the property and was not consulted either about the terms of the transfer or the selling price. At the time, Smith, Sr. was a prominent corporate and trusts attorney, Smith, Jr. was a young lawyer and Smith, Sr.'s daughter was married to an army officer stationed at various places from time to time.

From the time of the "sale" until his death in 1950, Smith, Sr. continued to manage and treat the property as if he continued to be the owner. He also retained the proceeds of all sales even after Smith, Jr.'s purported obligation on the promissory note had been satisfied.

Only after his father's death did Smith, Jr. assume active control over the property. In so doing, he communicated regularly with his sister and her husband, General Sadler, reporting on sales and developments, and seeking their advice about various matters pertaining to the property.

From 1951 until Mary Ambler Sadler's death in 1977, in all of Smith, Jr.'s correspondence with his sister, he referred to the Indian Beach property as if they were joint owners of the entire tract. For example, in 1951, Smith, Jr. wrote to his sister explaining that he had rejected an offer to buy an ocean front lot, saying "we should stick to our original price. . . . In my opinion there is only one way the property can go—and that is up." In discussing a proposed asking price for certain lots, in 1952 Smith, Jr. wrote: "Probably there will be no immediate takers at those figures, but it is just as well for us to establish the value and keep it high." In 1955, Smith, Jr. discussed with the Sadlers the possibility of suing an Indian Beach lot owner to enforce deed restrictions, stating that "we might jeopardize our whole position unless we take a firm stand." On other occasions, Smith, Jr. assessed the overall progress made at Indian Beach, noting that "we had an excellent year at Rehoboth," or "this is an excellent deal both for [the buyer] and for us," or "we made no sales." And, in suggesting various courses of action in managing the property, Smith, Jr. would ask the Sadlers, "what are your views?",

advising them that any changes would be "subject to your approval."

The evidence also reveals that throughout most of the period from 1953 to 1975, Smith, Jr. accounted to the Sadlers on a nearly annual basis for eighteen years. Over that span of years, Smith, Jr. followed the regular practice of making a year-end letter-report to his sister and General Sadler, in which Smith, Jr. either reported a deficit (eleven years) or a profit and distribution (seven years).

While Smith, Jr. made no accountings to his sister and General Sadler for the first five years after their father's death (1951–1955), Smith, Jr., during each of those years, corresponded with his sister and her husband over matters affecting the Indian Beach property as though they were its joint owners.

From 1956 forward, the yearly correspondence between the parties almost invariably included a year-end accounting in which both parties frequently described the lands as "the Rehoboth property." In 1956 General Sadler wrote to Smith, Jr., "I do not know whether I will be able to get to Washington for our annual settlements on expenses, taxes, etc. [with regard to the Rehoboth property]." Pursuant to each annual accounting, Smith, Jr. would either send his sister a check in the years when the property yielded a profit, or would expressly bill her for "your share of the deficit" in years where there were no sales. And the Trial Court so found, stating:

> [T]he annual summaries of profit or loss forwarded to her by Smith, Jr. were halved to the penny, and thus they are certainly susceptible to the interpretation that Smith, Jr. was accounting to his sister on the basis that he considered her to be an equal owner of the property along with himself.

Several events which occurred in 1963 merit particular attention. In 1963, Smith, Jr. deeded to his sister an undivided one-half tenancy-in-common interest in 7½ acres of an unimproved oceanfront parcel. Her brother advised her that he would pre-

pare a gift tax return covering the transfer and would advise her of the amount of tax for which she would be liable. Smith, Jr. then added that "from the tax standpoint this is the best way to handle the situation." His sister returned the form, attaching a note which read: "I filled out the form you sent me relative to the division of part of our property at the Indian Beach, as you know I don't understand any of these legal matters, so hope it's right." (sic). About the same time, Smith, Jr. stated that he had in mind a similar transfer of title to an additional 23 acres on the bay front. The record is silent as to why that transfer was never carried out.

Later in 1963, Mrs. Sadler requested that Smith, Jr. deed to her daughter an Indian Beach lot which her daughter wanted for personal use. Smith, Jr. agreed to do so on the condition that his son also be deeded a similar lot. However, her daughter changed her mind and neither transfer took place.

In late 1970, General Sadler died and his widow became financially strapped. However, Smith, Jr. continued to bill his sister for her share of the deficit, though he offered to defer payments because he "realize[d] that [she was] living on a limited budget."

In 1973, there were substantial sales of lots in Indian Beach; and Smith, Jr. split the net profits with his sister. In 1974, there were no profits. Mindful of his sister's financial situation, Smith, Jr., in his private records, made the following notation with regard to his 1974 accounting: "M.A.S. share [$]1,285.78. Did not bill her but will deduct in later years when there is a profit." A similar notation appears in Smith, Jr.'s records for 1975.

In 1976, the local government billed the Company $33,000 for water and sewer assessments. By the end of 1976, with his mother's health failing, her son, plaintiff Colonel John Sadler, took over his mother's affairs. He wrote to Smith, Jr. inquiring as to the extent of his mother's share of

the water and sewer assessments so that she could plan for what he assumed would be a sizeable expenditure. Sadler's letter was never answered.

In 1977, as mentioned previously, Mary Ambler Sadler died. Thereafter, Smith, Jr. assumed the position which he now maintains: that at all times since 1946 he has held the exclusive legal and equitable title to the Indian Beach lands, except as to the several lots or parcels thereof that had been, or were later, deeded to himself and his sister in their joint names.

## II

Mary Ambler Sadler's two children filed companion actions in the Court of Chancery seeking an accounting and declaration that all Indian Beach lands acquired by Smith, Jr. in 1946 were impressed with a trust for the equal benefit in fee of their deceased mother and their uncle.

In' the Court of Chancery, the parties disputed the significance of the facts outlined above. The plaintiffs sought the impression of an express trust on either of two findings: (a) that Smith, Sr., as a part of an overall estate plan, intended to create an oral trust in the land for the benefit of their mother; or (b) that Smith, Jr., by treating his sister as a joint owner over twenty-five years, had held himself out to be a trustee of such lands for her benefit.

Smith, Jr. denied the existence of an oral trust. In the initial discovery stage, he contended that the 1946 property transfer constituted a "sale" for consideration. Smith, Jr. also originally conceded that in his letters to the Sadlers, he had intentionally made it appear to his sister that she was, in fact, a joint owner, when she was not. Smith, Jr. stated that he did so out of concern for her self-esteem, and otherwise out of feelings of kindness and generosity towards her. However, at trial and on appeal, Smith, Jr. contends that the pay-ments he made to his sister were intended as gifts and were not made for the purpose of discharging any obligation to her in-curred by his father or assumed by him, the son.

Though the Court of Chancery found both of Smith, Sr.'s children to have been the equal objects of his affection, it ultimately concluded that judgment must be entered for Smith, Jr. and against plain-tiffs. Finding the rule of *Bodley v. Jones, supra,* to be controlling, the Court ruled that plaintiffs had not met the heavy bur-den of proof required for them to prevail.

That brings us to the error of law which we find the Trial Court to have committed and to defendant's related contention on reargument that this Court erred as a mat-ter of law by failing to hold plaintiffs to proof to "all reasonable certainty" of an intent of father or son to create an oral trust in the lands.

## III

 Under the law of this State, oral trusts in land are recognized. While in most states, the Statute of Frauds requires that interests in land must be in writing, in *Hall v. Livingston,* 3 Del.Ch. 348 (1869), the Court of Chancery found that the Stat-ute of Frauds. as adopted in Delaware spe-cifically omitted from the English Statute those portions which required a writing to create a trust in land. Thus, the *Hall* court concluded: "[T]here being no law re-stricting the mode of creating or proving trusts of land, they may be created and proved by parol." *Id.* at 367. In *Hall,* the Court then ruled that a court of equity could establish an oral trust in land as against a grantee who took pursuant to an ordinary deed, though the deed did not explicitly mention the creation of a trust. *Id.* at 380. However, one seeking to prove the existence of such a trust must do so by clear and convincing evidence. *Bradford v. Vinton,* Del.Ch., 153 A. 678, 684 (1930); *Hall v. Livingston, supra; Sadowski v. Rykaczewski,* Del.Ch., 147 A. 249 (1929). Thus, the proponent for impressing an oral express trust upon a deed otherwise abso-lute on its face has the heavy burden of proof "that is clear, full and satisfactory,

leaving no doubt of the existence of the trust alleged." *Bradford v. Vinton, supra* at 684. *See Ross v. Ellis,* Del.Ch., 106 A.2d 775 (1954).

With respect to the substantive Delaware equity law on impressing an oral express trust on the lands deeded in fee to defendant, the Trial Court correctly recognized that plaintiffs could prevail on either of two theories: (a) if they proved that the 1946 conveyance was the result of an oral trust understanding between father and son; or (b) if they proved that the son, by his conduct subsequent to his father's death and prior to his half-sister's death, declared, in effect, to her that he was holding all of the lands received from his father for their mutual benefit. On either showing, the Court recognized that the lack of a written instrument of trust would be no deterrent to relief.

The rule of *Hall v. Livingston, supra* and its progeny was adopted by this Court in *Bodley v. Jones, supra.* Therein this Court stated with respect to the quantum of evidence required, "[T]he words or the circumstances must admit of but one interpretation, and no trust is created if the transaction is as consistent with another form of undertaking as with that of a trust." *Id.* at 438.

The implicit assumption and underlying rationale for this rule is that it is intended to prevent the contradiction by written or spoken words or by conduct of a fee simple grantee's absolute ownership interest of real estate conveyed by deed. *Bradford v. Vinton, supra; Sadowski v. Rykaczewski, supra.* In short, the rule exists for the purpose of protecting the sanctity of a grantee's deed of bargain and sale. It is precisely for this reason that the proponent of an oral express trust must marshal evidence so clear as to admit of an intent (by grantor or by grantee) to create a trust "with all reasonable certainty." *Bodley v. Jones, supra.* As this Court elaborated in that case:

> [I]n order to create an express trust the intention so to do must be evidenced by definite, explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty. It follows, necessarily, that the words or the circumstances must admit of but one interpretation, and no trust is created if the transaction is as consistent with another form of undertaking as with that of a trust.

*Id.* at 438.

The Trial Court clearly felt bound by this rule as to burden of proof, notwithstanding plaintiffs' "viable" alternative grounds for impressing a trust and the substantial evidence in support thereof. The Court placed particular emphasis upon the stricture of the *Bodley* rule that, "the conduct or circumstances relied upon to prove the alleged trust must not be capable of another equally explanatory construction or be consistent with a different intention." The Court concluded that it must accept Smith, Jr.'s *post hoc* testimony as to his lack of donative intent to share the Indian Beach lands with his sister over the contemporaneous record of his conduct to the contrary. The Court found:

> Smith, Jr. never intended for his sister to have any more from the Indian Beach property than that which he gave her in monetary payment or by deed. I do not believe on the evidence presented that he ever considered that he held legal title to the Indian Beach property only as trustee for himself and Mrs. Sadler, or that by his acts and conduct over the years he ever intended to declare himself as trustee of an undivided one-half interest in the lands held in his name for the benefit of his sister and her heirs. In short, I do not find the circumstances relied upon to be so revealing and compelling as to manifest the required donative intent with all reasonable certainty.

■ Applying the *Bodley* rule, this Court originally concluded that the facts, inferences and deductions permitted but one reasonable interpretation—that Smith, Jr.'s conduct confirmed Smith, Sr.'s intent to create an oral trust. However, on rear-

gument, we now find the rule in *Bodley v. Jones* to have no application. Considering Smith, Sr.'s continued treatment of the property as his own, even after the 1946 deed transfer, that paper transaction has now been established to have been a sham (insofar as the deed purported to convey fee simple title solely to Smith, Jr.), and was so conceded by Smith, Jr. in reargument. With the destruction of the presumption of the deed's validity, the *Bodley* rule serves no purpose.[2] For plaintiffs to prevail, the Trial Court was not required to find "with all reasonable certainty" the creation of an oral trust in the land for the equal benefit of defendant's half-sister. Hence, plaintiffs are entitled to prevail upon a simple preponderance of the evidence that Smith, Sr. and Smith, Jr. intended to create an oral trust of the lands for the equal benefit of sister as well as brother.

## IV

We now return to the facts, borrowing liberally from this Court's original analysis. To begin, we note that the Trial Court found Smith, Sr. to have held both of his children in equal affection, with Smith, Jr. presenting no evidence to the contrary.

We find equally significant the contrived manner in which Smith, Sr. structured the transfer of the bulk of the Indian Beach property to his son. While the conveyance took the form of a sale for consideration to Smith, Jr., the reality was quite the opposite. As previously noted under section I above, Smith, Jr., as the putative buyer, in fact took no part in either the planning or implementation of the transaction; and notwithstanding the recitals in the documents, no consideration passed from son to father.

We found, and again find, that such conduct is totally inconsistent with a sale for consideration. Such conduct is consistent with the conceded fact that Smith, Sr. held both of his children in equal affection. Such conduct is also consistent with that of a landowner seeking publicly to divest himself of all indicia of title, for estate planning purposes, while privately retaining all the benefits of ownership for the remainder of his life.

Due to the intervening deaths of two of the three principals, the evidence may be sparse as to Smith, Sr.'s intent for ultimate distribution of the Indian Beach tract. However, the best evidence of Smith, Sr.'s intent may be deduced from the record of Smith, Jr.'s words and deeds over the twenty-five years of the remaining life of brother and sister. Again, we borrow liberally from this Court's original Opinion as to the evidence supportive of a trust based on the conduct of Smith, Jr. as the recipient of the property:

(1) Smith, Jr. did not assume control over the Indian Beach property until after his father's death. Despite the fact that Smith, Jr. held legal title to the land, the father continued to treat himself as the actual owner for the remainder of his life.

(2) Smith, Jr. never made any payments on the 1946 "sale", his debt obligations having been satisfied by Smith, Sr. through proceeds from the real estate transactions he arranged. Significantly, the father continued to retain all proceeds of land sales even after the purported debt had been paid.

(3) Over the ensuing twenty-five year period of his sister's life, Smith, Jr., in his correspondence with her, treated her as a joint owner. Smith, Jr. repeatedly sought the Sadlers' views on matters regarding the Indian Beach property. Previous mention has been made of the extent of the

---

**2.** The implicit holding in *Bodley v. Jones* is that whether an oral express trust will be impressed on lands *deeded in fee to another is* always a factual question, *i.e.,* a mixed question of fact and law and not simply a question of law. Thus, in *Bodley,* this Court, applying the rule, reversed the Court of Chancery's grant of judgment on the pleadings impressing a trust on a bond and mortgage and remanded the case for an evidentiary hearing. The written instrument which the Chancellor found conclusive as to decedent's intent to create an express trust, this Court found to be ambiguous. *Id.* at 440.

accounts rendered by Smith, Jr. to the Sadlers. As the Trial Court found, Smith, Jr. "halved to the penny" the expenses and profits from Indian Beach; and he continued this practice even after his sister's financial situation deteriorated following her husband's death.

(4) In 1963, Smith, Jr. refused to convey a lot to Mrs. Sadler's daughter unless his own son received a similar lot for his personal use. Ironically, once Mrs. Sadler's daughter decided she no longer wanted the property, any plans to transfer property to Smith, Jr.'s son were also aborted.

(5) Smith, Jr.'s conduct based on contemporaneous records made almost entirely by him is totally at odds with his after-the-fact testimony that his property transfers and payments to his sister constituted "periodic and random gifts." Indeed, in all of the correspondence between Smith, Jr. and the Sadlers from 1951 to 1975, there is but one reference to a gift, that, in 1963, when Smith, Jr. forwarded a gift tax return to his sister in connection with his conveyance to her of an undivided interest in the 7½ acre parcel. However, Smith, Jr.'s statement that, "from the tax standpoint this is the best way to handle the situation," clearly suggests that while he was structuring the transfer as a gift, it was not in fact a gift. Mrs. Sadler's answering note to her brother (referring to her lack of understanding regarding "that division of part of our property at the Indian Beach") clearly suggests that the conveyance was structured to look like a gift for tax purposes only as part of Smith, Sr.'s overall plan to pass Indian Beach on to the next generation.[3]

## V

Finally, we address Smith, Jr.'s assertions in his motion for reargument that this Court has reached an erroneous decision based on facts which are "simply wrong" and through an abuse of our standard of review of the findings and conclusions of the Trial Court.

One of Smith, Jr.'s principal assertions concerns his annual accountings. Smith, Jr. states that this Court, in its original Opinion,

> ... altogether misapprehends ... the regular references throughout the record to the "Annual Accountings", aligning those accountings to accountings on the entirety of the Indian Beach properties, when in fact as the record, unrebutted, clearly establishes, those accountings dealt *only* with jointly held properties titled *OF RECORD* in the name of Sadler and Smith.... The annual accountings ... clear[ly] were social occasions ... [and] had ... nothing to do with Smith, Jr.'s operation of the Indian Beach lands conveyed to him in 1946.... Consequently, one of the principal underlying bases of the Court's Opinion is simply *wrong* as a matter of fact.

However, the fact is that by 1957, or 1958 at the latest, the parties had sold the last of the two cottages on the Indian Beach lands that had been titled in their joint names. Nevertheless, in 1958 and each subsequent year, Smith, Jr. continued his practice of rendering year-end accountings to his sister and her husband in the form previously described, until 1973. By these accounts, Smith, Jr., in 1958, charged his sister with one-half of the real estate taxes on the entire tract and one-fourth of the annual franchise tax incurred by the Company.

In 1973, a year in which Smith, Jr. rendered no year-end accounting, he neverthe-

---

**3.** The Trial Judge refers to another "gift"—payment to Mrs. Sadler of one-fourth of the assessed value of Smith, Sr.'s Tracy Place residence ($7,500). Though the Trial Judge viewed this action as another example of Smith, Jr.'s largess, it apparently constituted part of an agreement to settle Smith, Sr.'s estate. In a letter dated March 2, 1951, several months following Smith, Sr.'s death, Smith, Jr. referred to the "balance due" the Sadlers on "our Tracy Place agreement." Thus, the $7,500 payment was apparently made pursuant to an agreement which the Sadlers had with Smith, Jr., as Executor of his father's estate, and was not a gift at all.

less distributed to his sister a check for $6,040.62. As Smith's contemporaneous bookkeeping records reveal, this sum represented precisely one-half of the "net after taxes" income from the entire tract, with the final distribution to her of $1,540.62 made March 15, 1974. Included in the expenses charged equally to each of them was a charitable contribution to the Beebe Hospital, Inc. of $2,000 and Rehoboth Country Club dues of $800.

Thus, Smith, Jr.'s reargument contention is patently contrary to the record and, indeed, is contrary to his previous representations in court. In the Trial Court, Smith, Jr., in a post-trial brief and in his initial brief in this Court, conceded the position that he now asserts. Thus, Smith, Jr. previously stated:

> [During the period 1951–1977, he] ... Judge Smith did assess and charge his half-sister for one-half of the expenses incident to the operation of the Indian Beach properties, requiring that she pay a portion of those expenses.

As previously noted, from at least 1958 through 1972, Smith, Jr. rendered accounts to his sister with respect to the entire tract; and in 1973, he halved with his sister to the penny the net income.

Smith, Jr. also contends that the Court has erred in attributing undue significance to distributions to his sister which he now characterizes as "entirely random." Again, his records are clearly to the contrary. They disclose that there were ten years in which distributions were made by Smith, Jr.; and there were eleven years in which yearly deficits were incurred, thereby accounting for twenty-one years of sharing of profits and losses on the lands in question. Thus, the record decisively refutes Smith, Jr.'s characterization of his distribution to his sister as "entirely random."

With respect to Smith, Sr.'s intent in 1946, Smith, Jr. argues that his father's transfer of two Indian Beach lots to his daughter is "altogether inconsistent" with a conclusion that an oral trust was created of the residue of the land and for the ultimate benefit of both daughter and son. At the same time, Smith, Jr. now concedes (a) that the transaction was a sham sale with his father retaining full equitable ownership of the tract; and (b) that until his father's death, he, the son, did in fact hold fee title under an oral trust. If one focuses entirely upon the conduct of Smith, Sr. as settlor, there is no ambiguity as to his intentions. He, as settlor, intended to convey the Indian Beach lands to his son in trust for the father's exclusive benefit during the remainder of his life. (See section IV above.) It is equally clear from the conduct of both settlor and Smith, Jr. from 1946 until settlor's death that Smith, Jr. was at all times acting as a trustee of the lands for the immediate benefit of his father.

The question then becomes, who were the intended ultimate beneficiaries of that land trust. The Trial Court declined to find any oral trust to have been created by Smith, Sr. or administered by Smith Jr., notwithstanding the overwhelming evidence to the contrary from 1946 through 1975. The Court refused to impress a trust because in the end it felt compelled to accept Smith, Jr.'s denial of an intent to create the trust. The Court stated:

> Against this I am forced to balance the denial by Smith, Jr. in his testimony that any such oral trust agreement ever existed between him and his father. In addition to being a member of the bar, Smith, Jr. is now and has for years been a member of the federal judiciary, a factor which I can scarcely take lightly when evaluating his testimony under oath.

We conclude that the evidence of an intent of Smith, Sr. as settlor to create a trust and of Smith, Jr. as trustee to administer the trust is manifest through the conduct of both parties. We further conclude that the best evidence of the intent of settlor and trustee as to the ultimate beneficiaries of the trust is revealed through the consistent pattern of conduct of Smith, Jr. as trustee for nearly twenty-five years.

Thus, we find the Trial Court's ultimate reliance upon the credibility of Smith, Jr. as a witness and disregard of his conduct and record-keeping over the years to the contrary to be clearly erroneous.

We must reject Smith, Jr.'s explanation of both the 1946 transfer and his course of dealings of twenty-five years with his sister because his explanations cannot be reconciled with the record of his words, deeds and conduct over that span of years. In our view, it was incumbent upon defendant as the only survivor to give a rational explanation for his conduct. This he clearly failed to do, as the record bears out; and the Trial Court also found to be "somewhat disturbing."

> As to why Smith, Jr. chose to bill his sister in certain years for such picayune amounts as $299.85 for her share of the deficits on the property during that year, I find it difficult to say. His explanations are somewhat inconsistent and perhaps not even logical when viewed with the objectivity of an outsider. And I must concede that I find this factor somewhat disturbing. Yet perhaps, as he indicates, it was just his way of permitting his sister to share during her lifetime in his fortunes in handling the beach lands which had formerly been owned, in effect, by their father. Perhaps, in view of the manner in which the land values in Indian Beach took off during the 1960's, he felt some sense of uneasiness because his father had conveyed so much of the land to him to the exclusion of his sister, and as a consequence he may have felt some corresponding moral obligation to allow her to participate during her lifetime in whatever his economic experience in the property might be. But I can only speculate on this. I do not know.

■ In reviewing the factual findings of a trial judge, this Court may review the entire record and, when the findings of the court below are "clearly wrong and the doing of justice requires their overturn ... we are free to make contradictory findings

of fact." *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972). Here, after careful review of the record, we hold that the findings of fact and the inferences and deductions which the Trial Judge drew therefrom are clearly wrong and that justice requires a different result.

\* \* \* \* \* \*

REVERSED and REMANDED with directions to the Trial Court to enter judgment for plaintiffs in accordance herewith.

## UPON MOTION FOR REARGUMENT

Defendant-Appellee, John Lewis Smith, Jr., has moved for reargument as to the duration of the oral trust found by the Court to be impressed upon the Indian Beach lands for the benefit of plaintiffs, Mary Sadler Levin and John Ambler Sadler. In the alternative, defendant moves for remand of the case to the Court of Chancery to permit the record to be reopened for a further evidentiary hearing. The purpose of the hearing would be to determine the ultimate beneficiaries of the oral trust impressed upon the lands—a question which defendant argues this Court's opinion leaves undecided. Defendant now contends, and would seek to establish, that the trust share of his half-sister, Mrs. Sadler, was intended to be limited to her lifetime and that upon her death, the trust should terminate and her interest in the real estate would pass to defendant as the remaining fee simple owner and holder of the record title to the real estate.

■ Defendant Smith argues that there is no evidence of record to support this Court's "apparent finding that the trust established by his conduct continues after the death of Mrs. Sadler on the same terms and conditions." Defendant Smith misconstrues this Court's decision. This Court has not ruled that the trust imposed upon the land for the benefit of Mrs. Sadler was limited, in effect, to that of a life estate; nor did we say that the trust continues

beyond her life. Our ruling was (and remains) "that an oral trust be impressed upon the land in question for the equal benefit of Smith, Sr.'s two children," that is, his daughter, Mary Ambler Sadler, and his son, John Lewis Smith, Jr. Slip op., p. 3. The legal effect of this ruling is that Mrs. Sadler and John Lewis Smith, Jr. each became, upon the death of their father, John Lewis Smith, Sr., fee simple owners as tenants in common of a fifty percent undivided interest in the Indian Beach lands; and that upon Mrs. Sadler's death, her two children, the plaintiffs, Mary Sadler Levin and John Ambler Sadler, succeeded by operation of law to their mother's fifty percent tenancy in common interest in all of the then-remaining and unsold Indian Beach lands that had been deeded in 1946 to John Lewis Smith, Jr. As we previously found, the evidence permits but one reasonable conclusion: that following the death of Smith, Sr., Smith, Jr. held the lands for the equal benefit of himself and his half-sister, Mary Ambler Sadler; and that she, by virtue of the oral trust, became, upon her father's death, an equitable owner of an undivided one-half fee simple interest in the whole tract, with the remaining one-half interest thereof being held by her half-brother, John Lewis Smith, Jr.

Therefore, the case is remanded to the Court of Chancery with instructions to fashion an appropriate remedy and enter such order as shall be required to reflect that the plaintiffs, Mary Sadler Levin and John Ambler Sadler, possess jointly as tenants in common to each other a fifty percent undivided interest with John Lewis Smith, Jr. in all the remaining unsold Indian Beach lands which were conveyed by deed in 1946 to John Lewis Smith, Jr. Defendant Smith shall also be required to account to plaintiffs for their share of the proceeds of all real estate transfers involving the Indian Beach lands made by defendant Smith from 1946 to date.

The motion for reargument is denied.