EQUITABLE TRUST COMPANY, a corporation of the State of Delaware, ANNA M. HOBSON and MARGUERITE C. GLENN, co-executors under the last will and testament of ELLA M. GLENN, deceased,

Defendants Below, Appellants,

*vs.*

NELLIE B. G. HOLLINGSWORTH,

Complainant Below, Appellee.

*Supreme Court, On Appeal, Sept. 30, 1946.*

RICHARDS, C. J., and SPEAKMAN, TERRY, and CAREY, JJ., sitting.

*Caleb S. Layton,* of Richards, Layton and Finger, for appellants.

*Daniel J. Layton, Sr.,* for appellee.

CAREY, JUDGE, delivering the opinion of the court:

The legal principles applicable to this case are so well settled that a mere summary of them will suffice; in fact, there seems to be no real difference of opinion on the part of counsel concerning those principles. It should be said that we are not here concerned with the equitable rules pertaining to fraud or mistake, as our examination of the matter is limited to the question of whether or not a valid and enforcible contract to bequeath has been satisfactorily established.

Equity will enforce a valid contract to make a will, usually by imposing a trust upon the property involved, but, in order to be enforceable, the contract must be clearly proved and must be certain and unambiguous in all its terms; such a claim requires the closest and the most careful scrutiny to prevent injustice being done. *Page on Wills, (Life Time Ed.) Sec.* 1711; *Pomeroy, Equity Jurisprudence, (5th Ed.) Sec.* 1405; *Rash v. Equitable Trust Company, 5 W. W. Harr.* 139, 159 *A.* 839. To be enforceable, there must be consideration; but forbearance to sue, if the right of action is asserted in good faith, is a sufficient consideration even if the claim is doubtful. *Page on Wills, supra; Williston on Contracts, (Rev. Ed.) Sec.* 135. "The reality of the claim which is given up must be measured not by the state of the law as it is ultimately discovered to be, but by the state of the knowledge of the person who at the time has to judge and make the concession." 12 *Am. Jur.* 582. The Delaware statute requiring a contract to make a will to be in writing does not apply to such contracts made prior to May 1, 1933. 3106, *Sec.* 6, *Ch.* 77, *Revised Code of Delaware* 1935. Finally, this court ordinarily will not disturb a finding of facts made by the Chancellor, if it appears from the record that there was evidence to support the finding. *Chalfant v. Reinhardt,* 12 *Del. Ch.* 389, 113 *A.* 674.

Appellants say that the Chancellor did not properly apply these principles to this case because (a) the evidence

lacks the certainty and clearness necessary to prove the contract and (b) the evidence fails to establish the alleged consideration.

It is contended, in the first place, that the only real evidence that a contract was ever made is in the testimony of Mae Handy, a servant in the home of Mrs. Hollingsworth; and that her testimony was so inconsistent and contradictory as to be unworthy of belief. A study of the record makes it apparent that her testimony was particularly important. In making his findings, the Chancellor must have relied strongly upon her statements. He saw and heard her testifying and we cannot criticise him for believing her.

This witness was present on the two occasions when Mrs. Hollingsworth talked to her mother about reassigning the policy. On direct examination, after certain preliminaries, she testified as follows:

"Q. Won't you state in your own way what you heard? A. Well, Mrs. Hollingsworth told her that she would take her to law.

"Q. She would take her to law? A. She would take her to law about the policy. She asked her not to do it. She says, 'Please don't do it,' by no means not to do it. She says, 'You know you aren't well, and I will keep the policy to help with the children.' And she says, 'If you die before I do, I will take care of the children and educate them. If I die before you,' she says, 'I will return the policy and all that goes with it, in my will, to do as you please with, and if I get anything out of it I will share it with you.' And she says, 'Taking God for my witness.' "

On cross-examination, her testimony as to this conversation was as follows:

"Q. Give me as best you can the exact words that Mrs. Hollingsworth used. A. That is what she told her, that she was going to take her to law about the policy. She asked her not to take her.

"Q. Who asked her? A. Mrs. Glenn asked her not to.

"Q. Asked Mrs. Hollingsworth not to take her to law? A. Yes.

"Q. What was the rest of the conversation? A. She told Mrs. Hollingsworth, 'You know you aren't well.'

"Q. Yes. A. 'And I will keep the policy for you and the children.'

"Q. Yes. A. And she says, 'If you die before I do,' she says, 'I will educate and take care of the children.' But if I die before you do, why I will turn the policy and everything that goes with it over in the will for you and the children.'

"Q. I see. Was that all there was of the conversation? A. And she says, 'If I get anything out of the policy,' she says, 'I will share it with you.'

"Q. 'I will share it with you'? A. Yes."

It is said that no trust could be founded upon this testimony alone because the two statements are contradictory as to the identity of the beneficiaries, the first statement suggesting that Mrs. Hollingsworth was to be the sole legatee and the second statement suggesting that she and her children were to benefit.

An examination of all the testimony in the case convinces us that these statements, while having at first glance the appearance of a conflict, are nevertheless reconcilable with the conclusion that Mrs. Hollingsworth was to be the sole legatee. At one time Mrs. Hollingsworth had some difficulties with her husband and apparently her purpose in buying the policy was to protect her children. There is repeated reference in the testimony to indicate that both she and her mother were primarily interested in the protection and care of those children. There is evidence to justify the belief that both of them had in mind the eventual benefit to the children when discussing the policy. Evidently the reason for making Mrs. Glenn the sole beneficiary was that she might be better enabled to take care of the children if Mrs. Hollingsworth predeceased her. The record contains evidence that the appellee, when demanding the reassignment, told her mother that she wanted to make her children beneficiaries of the policy. No doubt, the Chancellor reached the conclusion that Mae Handy meant by her second statement that the policy was to be bequeathed to the appellee in order that she might make her children the

beneficiaries thereof. Viewed from this angle, the statements are not necessarily contradictory, and, when considered with the rest of the testimony, furnish sufficient justification for the Chancellor's finding.

The testimony of Abner Hollingsworth, Jr., while in itself hardly sufficient to be conclusive, does tend to corroborate the evidence of Mae Handy. He stated that some time in 1933 he heard his grandmother tell the appellee that the policy would be turned back to her in the case of the grandmother's death. He quoted Mrs. Glenn as saying, "she would leave it to her."

The conceded fact that Mrs. Glenn actually paid to the appellee the sum of $10 per month from the time the monthly benefits commenced until her death likewise lends some support to the contention of the appellee. The evidence indicates that it was the practice for Mrs. Hollingsworth to send her son to the home of her mother to get these payments and that on a few occasions he had to go back the second time to get the money because, as Mrs. Glenn is alleged to have said, "the check has not come from the Insurance Company" or "(I have) not got it cashed." These payments could very logically be interpreted to be an acknowledgment of or compliance with the agreement by the mother, or at least that part of the agreement pertaining to the sharing of the benefits. The regularity of the payments and the apparent reliance upon the insurance checks as the fund from which they were paid suggest something more than mere gifts.

Aside from any testimony of the appellee herself, we consider that there was sufficient evidence to support the Chancellor's finding concerning the contract to make a will.

In the second place, the appellants contend that the evidence is insufficient to prove a consideration for this promise. As indicated above, the alleged consideration was the promise of the appellee not to sue her mother by reason

of the fraud which she claimed had been practiced upon her. The proof of this point is found in the statements of Mae Handy, quoted above. The appellants suggest that the mother was then thinking only about the physical condition of her daughter and the effect which a lawsuit might have upon her health. However, the Chancellor construed the meaning of this episode differently and interpreted it in the manner suggested by the appellee, namely, that Mrs. Hollingsworth was being promised the legacy if she would not bring the suit. Actually, of course, no suit was brought. We cannot say that there was not sufficient evidence before the Chancellor to justify his finding in this respect.

The decree of the court below will be affirmed.