Beverly C. CRAVERO, formerly Beverly C. Holleger, Plaintiff,

v.

Donald W. HOLLEGER and Saundra Lee Holleger, Defendants.

Civ. A. No. 951–K.

Court of Chancery of Delaware, Kent County.

Submitted: June 3, 1989.
Decided: July 18, 1989.

---

William A. Denman, of Schmittinger & Rodriguez, P.A., Dover, for plaintiff.

Joshua M. Twilley and Charles W. Welch, III, of Twilley, Street and Braverman, Dover, for defendants.

## OPINION

CHANDLER, Vice Chancellor.

This suit involves the equitable and legal title to approximately 27 acres of property located near Canterbury, Kent County and known as the Flying Dutchman Trailer Park (the "Flying Dutchman" or the "property"). Plaintiff Beverly C. Cravero, formerly Beverly C. Holleger ("ex-Wife"), is the former wife of a past owner and the developer of the property, Donald W. Holleger ("Husband"), now deceased. Husband's estate is one of the defendants in this action.[1] Defendant Saundra Lee Holleger ("Widow") was the wife of Donald W. Holleger at the time of his death. She is the current record owner of the property and the executrix of Husband's estate. In order to effectuate a property settlement agreement entered into between Husband and ex-Wife, ex-Wife asks this Court to impose a constructive trust in her favor on the property and a mandatory injunction requiring Widow to convey to her an undivided one-half interest in the Flying Dutchman (subject to certain charges and accountings), or award to her its fair market value.

The defendants have moved for summary judgment. This is my Opinion with respect to that motion.

### I. *Background Facts*

Husband and ex-Wife were married in 1948 and divorced on February 16, 1973. During the marriage, Husband and ex-Wife acquired as tenants by the entireties the property now known as the Flying Dutchman. A small trailer park was located on

---

1. This suit was initially brought against Donald W. Holleger during his lifetime.

part of the property at the time of purchase.[2] Husband and ex-Wife expanded and developed the property and trailer park during the marriage.

In contemplation of their divorce, ex-Wife and Husband entered into a property settlement agreement on December 20, 1972 (the "Agreement"). The Agreement was prepared by the lawyer for ex-Wife.

The Agreement divided the personal and real property of the marriage between Husband and ex-Wife. With respect to the Flying Dutchman, it provided as follows:

"2.(A). The husband shall have all of the real and personal property comprising the Flying Dutchman Trailer Park located near Canterbury, Kent County, Delaware, consisting of approximately 27 acres with the improvements thereon erected subject to the terms and conditions hereinafter set forth.

1. The husband shall pay to the wife $550 per month on the first of each month commencing on the date of the execution hereof for a term of 20 years. So long as there are minor children of this marriage residing with the wife, $100 per month of the aforesaid sum of $550 per month shall be regarded as child support paid by the husband for each such minor child residing with the wife. The balance of said sum of $350 per month paid by the husband to the wife, shall be in payment to the wife of her interest in the Flying Dutchman Trailer Park. The aforesaid monthly sum of $550 shall be reviewed each year and shall be modified either upwards or downwards depending on the fluctuation up or down of the cost of living as determined by the Federal Government when compared to the cost of living as determined for calendar year 1972.

2. The husband shall have the right to sell the business and property known as the Flying Dutchman Trailer Park at any time for a sum not less than $180,000 in which case the wife shall receive one half of the net proceeds of such sale after deducting normal expense of this sale. In the event of a sale as permitted by this paragraph and upon payment to the wife of her share as herein provided, the husband shall be relieved of any further payments to the wife under the terms hereof, but not child support, and further payments made to the wife hereunder up to the time of said sale for her support ($350 per month) shall be deducted from the one half share provided for the wife herein.

3. In the event the Flying Dutchman Trailer Park is not sold as herein provided at the time of husband's death, the husband if he is not married at the time of his death, shall devise the Flying Dutchman Trailer Park to the wife; in the event the husband has remarried and remains remarried at the time of his death, the husband shall by will devise the Flying Dutchman Trailer Park as follows: one half to the wife herein subject to a charge, however, against said one half interest in the sum equivalent to the total number of monthly payments computed at the rate of $300 per month paid to the wife in accordance with subparagraph 1 hereof; and the remainder to his second wife."

On August 20, 1973, ex-Wife executed a special warranty deed (the "1973 deed") conveying the property comprising the Flying Dutchman to Husband. This deed was recorded on August 27, 1973. Sometime thereafter, Husband executed a mortgage on the Flying Dutchman property together with a bond, in favor of ex-Wife, for $132,000. Across the top of the document of mortgage was printed the following language: "Not to be recorded during the life of Donald W. Holleger".[3]

---

2. The property was purchased in several parcels at different times during the marriage.

3. The bond and mortgage are dated October 2, 1972, that is, some two and a half months prior to the Agreement. The Husband in deposition testimony indicated that he believed that the bond and mortgage were executed on or about

the stated date. Ex–Wife in deposition testimony maintained that the bond and mortgage were executed at her insistence and for her security in connection with and sometime after the August 20, 1973 deed by which she conveyed title to Husband. This being a motion for summary judgment I will not weigh these two conflicting pieces of evidence but will resolve the discrep-

On October 12, 1973, Husband and Widow were married. They remained married until Husband's death on August 2, 1987. Throughout the course of this marriage, Husband and Widow continued to expand and develop the Flying Dutchman as a trailer park.

On November 4, 1974, Husband and Widow executed a deed (the "1974 deed") conveying the property to themselves as tenants by the entireties. This deed was recorded on November 12, 1974.

In November of 1977, Husband and ex-Wife executed an untitled document "to verify payments on the property settlement agreement/second mortgage on the property known as the Flying Dutchman Mobile Home Park between Donald W. Holleger and Beverly Holleger Cravero." This document indicates that Husband had made timely payments under the Agreement through November of 1977, had paid a total of $34,100 to ex-Wife at that time and would as of December 5, 1977 "owe a balance of $97,900 to be paid at the rate of $550 per month, the last payment being September 5, 1992, at which time Beverly Holleger Cravero will have received a total of $132,000 and will be paid in full." Husband apparently continued to make timely payments under the Agreement until after the filing of this action.

In the early 1980's, Husband developed a cancer. In anticipation of his death, on March 23, 1984, Husband and Widow executed a deed (the "1984 deed") conveying the property to Widow as sole owner. No consideration was given in connection with the conveyance, which was made in an attempt to reduce the taxes which would become due at Husband's death. This conveyance was not recorded until March 23, 1987.

In 1987, Husband became gravely ill with cancer. On being informed that he had not long to live, ex-Wife, who had masked the "not to be recorded" language on the face of the mortgage which Husband had executed in her favor, had the mortgage recorded by her attorney. At this time, ex-Wife discovered the November 4, 1974 and March 23, 1984 conveyances of the property in favor of Widow. On April 6, 1987, ex-Wife had a copy of the Agreement recorded. She filed this lawsuit on the same day.

On April 30, 1987, Husband's deposition was taken in connection with this lawsuit. Later that day, he entered an agreement to convey all his interest in the property to Widow via a quit-claim deed. A deed effectuating this transaction was filed on May 4, 1987. The stated consideration for this conveyance, $180,000, was not the result of any negotiation or appraisal.

The purchase was financed by a loan from the First National Bank of Wyoming for $180,000. Of this sum, $86,026.01 was deposited in a joint checking account maintained by Husband and Widow. These funds were then paid back to the First National Bank of Wyoming to reduce the principal on the loan. $35,200 of the proceeds of the sale were sent by Husband to ex-Wife. After receiving this payment, ex-Wife satisfied the mortgage which she held on the property, but specifically reserved all claims which she had on the property based upon the Agreement.

On August 3, 1987, Husband died. In his will, he devised his entire estate to Widow, who was also named executrix.

Ex–Wife has introduced evidence that the fair market value of the property as of May 1, 1987, was $915,000.

## II. *The Agreement as Trust*

█ Ex–Wife argues that the Agreement creates a trust, with herself as the settlor and cestui que trust, Husband as the trustee and her undivided one-half interest in the property as the trust corpus.[4]

---

ancy in favor of the nonmoving party in order to determine whether that evidence supports a favorable conclusion to the nonmoving party. *Continental Oil Co. v. Pauley Petroleum, Inc.,* Del.Supr., 251 A.2d 824 (1969).

**4.** At the time the Agreement was entered into, Husband and ex-Wife were tenants by the entireties. Thus, both Husband and ex-Wife "owned" the entire property "per tout et non per my." That is, by the legal fiction that is at the heart of tenancy by the entireties, the marital unit (and not the Husband and ex-Wife individ-

Husband would thus be subject to all the fiduciary duties encumbent upon a trustee, and ex-Wife argues that, as a consequence, she is entitled to the relief which she seeks in this suit.

Defendants contend that the Agreement is not a trust, and that it gives ex-Wife only personal contractual rights. I agree.

■ Nowhere in the Agreement are there express words of trust. This alone, however, is not fatal to ex-Wife's argument. No particular words or form are required in order to create an express trust. *Bodley v. Jones*, Del. Ch., 32 A.2d 436 (1943); *Walsh v. St. Joseph Home for the Aged*, Del.Ch., 303 A.2d 691 (1973). All that is required is that the parties intended that a relationship, which equity would describe as a trust, exist. "When a question arises as to whether or not an agreement creates a trust, the courts look objectively at the result to determine the matter.... The question in each instance is whether the kind of relationship known to the law as a trust has been created." *Fulweiler v. Spruance*, Del.Supr., 222 A.2d 555, 560 (1966). It is the intent of the settlor as expressed in the agreement itself which is controlling as to whether a trust has been created. *Hanson v. Wilmington Trust Co.*, Del.Ch., 119 A.2d 901 (1955), *aff'd*, Del.Supr., 128 A.2d 819 (1957). It is immaterial that the parties did not know that they were creating a trust. *Fulweiler v. Spruance, supra.* However, the Court is cognizant of the mischief which could be created with respect to the system of conveyance of real property in connection with the erroneous determination by the Court that express trusts have been created. As a result, it has been said that no trust is created by a transaction that is as consistent with another form of undertaking as

with that of trust. *Bodley v. Jones, supra.*[5]

A). Express Terms of the Agreement.

■ Ex–Wife here claims that the language of the Agreement is "clear, simple and unambiguous", demonstrating her intent to settle trust property upon Husband with beneficial enjoyment in herself. She points to the fact that Husband was given the right to sell the property "at anytime" for not less than $180,000, with one half of the net proceeds (less the monthly payments which had been made under § 2(A)(1)) to go to ex-Wife. She also points to the clause in the Agreement which requires Husband to devise the entire property to her should he be unmarried at the time of his death, and to devise one half of the property to her (less the monthly payments which had been made to her) should he be married at the time of his death.

■ I am satisfied, however, that the Agreement, read as a whole, does not evidence intent on the part of the ex-Wife to create what is recognized in the law as a trust. A trust exists when one person holds title to property for the benefit of another. Trusts involve recognition of two types of ownership of property: 1) legal ownership, which in a trust is held by the trustee, and 2) beneficial ownership, which in a trust is held by the cestui que trust. *Fulweiler v. Spruance, supra.* The Agreement at issue is an allocation of the property of the marriage, some to the wife, some to the husband. With respect to the Flying Dutchman, Husband is to "have all the property subject to the terms and conditions hereinafter set forth".

The first obligation of Husband upon which his "having" the property is conditioned, set out at § 2(A)(1) of the Agreement, is that he is to pay $550 per month

---

ually) was possessed of the complete fee in the property. *Huber v. Penn Mut. Fire Ins. Co.*, Del.Super., 33 A.2d 729 (1943); *Heitz v. Sayers*, Del.Super., 121 A. 225 (1923). The Agreement was made in contemplation of divorce, however. In Delaware, upon divorce, property held by the entireties is converted by operation of law to property held as tenants in common. *See Mitchell v. Wilmington Trust Co.*, Del.Super., 449 A.2d 1055 (1982), *aff'd*, Del.Supr., 461 A.2d

696. Thus the ownership by the marital unit is eliminated and the ownership of the two individuals is "reduced" from ownership of the entire parcel (in connection with similar ownership rights of the other party to the marital unit) to undivided one-half interests in the property.

**5.** *See* the discussion of *Bodley v. Jones, infra*, pages 14–15.

for a term of 20 years. So long as there were minor children of the marriage residing with ex-Wife (there were two at the time of the divorce) $100 per month per child was to be considered as a child support payment. The balance, $350 per month, was to be "in payment to the wife of her interest in the Flying Dutchman." In another paragraph, this payment is said to be "for her support".

Under the Agreement, so long as Husband remained in possession of the Flying Dutchman (as long as he did not sell it during his lifetime), *he* was to enjoy the beneficial ownership of the property, subject only to the charge of $550 per month. $200 of the $550 payment was for support of the children and not related in any way to the property. The remaining $350, in payment of ex-Wife's "interest" in the Flying Dutchman, was in no way related to income from the property. In fact, the undisputed tax records regarding the property indicate that in the early years after the divorce the Flying Dutchman did not make a profit. In years when it did, however, there was no requirement under the Agreement that such funds should be distributed to ex-Wife as beneficiary or reinvested or added to the corpus. They were for Husband's enjoyment.

This settled monthly payment is not consistent with beneficial ownership remaining in ex-Wife. It *is* consistent, however, with compensation by Husband for ex-Wife's one-half undivided interest in the property.

I also find the sale provision § 2(A)(2) of the Agreement to be inconsistent with the creation of a trust. Husband was given the "right" to sell the property for any amount in excess of $180,000. While one half of this (net of the cost of the sale) was to go to ex-Wife, the amount of "support" payments, or payments "for her interest in the Flying Dutchman" were to be deducted from this amount. I also note that upon sale for more than $180,000, the Husband's obligation to make monthly payments was terminated. .

Finally, the will provision contained in § 2(A)(3) seems inconsistent with an intention on the part of ex-Wife to have her one-half interest held in trust. I note that, in case Husband had not remarried at the time of his death, the Agreement called for the *entire* Flying Dutchman to be devised to ex-Wife. This is inconsistent with an intent to merely retain beneficial ownership of her one half interest. Once again, in the case where Husband died having remarried, payments made to ex-Wife under the Agreement were to be deducted from her one-half share.

As discussed below, the parties differ as to whether the Agreement is in the nature of a contract for deed for the transfer of fee simple absolute title to Husband, with the "sale" and "death" provisions of §§ 2(A)(2) and 2(A)(3) intended only to provide security for the payments due to ex-Wife during the 20–year term of the contract, or whether the sale and death portions of the Agreement were meant to be independent of the payments due under § 2(A)(1). Whichever is correct, the provisions with respect to the Flying Dutchman are part of the "promises and mutual undertakings" set forth as the consideration for the Agreement, that is, they constitute a contract between the parties which places enforceable personal responsibilities upon Husband. No intention to create a trust is manifested by the Agreement. *Compare Fulweiler v. Spruance, supra.*

B). The *Bodley v. Jones* Rule.

■ In reaching this result, I have not applied, as defendants requested me to, the *Bodley v. Jones* rule to the Agreement. The rule in *Bodley v. Jones,* as discussed in the more recent Supreme Court case of *Levin v. Smith,* Del.Supr., 513 A.2d 1292 (1986), is one of burden of proof: "In order to contradict by written or spoken words or by conduct the presumption of a grantee's absolute ownership of real property conveyed to him by deed in fee simple absolute, one seeking to prove an express trust must demonstrate the intent to create such a trust 'by definite explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty.'" *Levin v. Smith, supra* at 1297, *quoting Bodley v.*

*Jones.* The rule was imposed in *Bodley* itself upon a purported document of trust found to be ambiguous and contradicted by the subsequent conduct of the putative settlor. *Levin v. Smith, supra,* concerned an oral trust overwhelming evidence for which was provided by the subsequent conduct of the settlors, trustee and beneficiary. The only evidence weighing against the existence of the trust in *Levin* was the bald testimony of the trustee that no trust had been intended, and the fact that the existence of a trust would contradict the terms of a deed which purported to transfer the trust corpus to the trustee in fee simple absolute. The evidence at trial showed that this deed was a sham, however, in that the grantee did not relinquish possession of the property during his lifetime. The trial court, applying the *Bodley v. Jones* rule, held that the testimony as to lack of intent on the part of the trustee was sufficient to defeat a finding that a trust existed.

The Supreme Court reversed, holding that the *Bodley* rule had no application to that situation. Since the deed was a sham, there was no presumption of title for the *Bodley* rule to protect, and thus a mere preponderance of the evidence was sufficient to prove the existence of a trust.

It is unclear whether the *Bodley* rule would apply to the instant situation. As in *Levin v. Smith,* the deed purporting to grant fee simple absolute to Husband (the 1973 deed) appears to have been a sham. Ex-Wife's testimony indicates that it was not intended to give present exclusive ownership to Husband, but merely to allow him to borrow upon the property. There are subsequent transfers of the property here, however, including the 1974 deed to Widow by the entireties. There is no evidence that this transfer was a sham. Fortunately, I need not decide this question, because the burden of proof rule of *Bodley v. Jones* is not applicable here for other reasons.

In reaching a conclusion that no trust was created by the Agreement, I am *weighing* no factual evidence. The Agreement, ambiguous with respect to certain of its contract provisions, is clear in demonstrating, as a matter of law, that no trust was created. Therefore, the *Bodley* rule has no application here. Even if the Agreement were ambiguous as to trust, and, in the manner of *Bodley* and *Levin,* I was forced to examine evidence of the subsequent conduct of the parties, there is absolutely nothing in this conduct to indicate that a trust was intended or created. The purported trustee, Husband, never provided an accounting or did anything else to indicate that he was a fiduciary for the purported beneficiary, ex-Wife, other than to pay her the set monthly amounts due under the contractual provisions of the Agreement. Ex-Wife was content to accept these payments, without demanding distribution of profits, an accounting, or anything else which would tend to indicate her belief that a trust existed.

Since the Agreement is clear on its face with respect to the trust issue, and since no evidence to the contrary has been submitted, I am not presented with a situation where the weighing of factual evidence comes into play and I am spared the need to consider the application of the *Bodley v. Jones* rule.

C). *Fulweiler v. Spruance* Distinguished.

Plaintiff has cited no cases factually similar to this case which held that a trust was created. A superficially similar Delaware case exists which I think it is worthwhile to distinguish, however. In *Fulweiler v. Spruance, supra,* as in the instant case, a husband and wife entered into a property settlement agreement in contemplation of divorce. The agreement provided that certain property, in the form of shares of stock, was to be held by the husband, with dividends paid to his wife and children. At his death, the stock was to go to his children.

In that case, the Delaware Supreme Court found that a trust existed. "[Husband] has set aside certain securities and by stop transfer orders has made it impossible for him to deal with them as his own property. He has obliged himself to pass on the dividends received on these himself to pass on the dividends received on these

securities to his former wife and children. He has obligated himself to provide by will the ultimate vesting of title to these in his children or their issue. In short, the agreement divests [Husband] of any beneficial interest in the corpus, represented by the securities separately held, and has transferred that interest to his wife and children. The fundamental elements of a trust relationship thus exist." 222 A.2d at 560.

While factually similar, *Fulweiler* is distinguishable from the instant case in one very important aspect. In *Fulweiler* the husband paid *all* benefits received from the securities forming the corpus of the trust to the beneficiaries. The property acquired through the securities other than as dividends (such as stock from stock splits) was to be added to the corpus. While he was responsible for passing along dividends, he had no obligation in connection with the securities to make fixed payments in excess of any dividends. In other words, as the *Fulweiler* Court found, beneficial interest in that case was transferred to the wife and children as beneficiaries. The husband was left with title but no enjoyment or use of that title. In contrast, Husband in the instant situation by the terms of the Agreement was not responsible to ex-Wife for the profits from the Flying Dutchman. He *was* responsible for fixed payments regardless of whether those payments could be made out of Flying Dutchman profits. Those payments were to have the effect of reducing any amounts of money or property interests due ex-Wife upon sale of the property or Husband's death. In other words, the beneficial ownership in *Fulweiler* was with the beneficiaries, the wife and children. In the instant case, beneficial ownership was in the Husband, and this interest was transferred to him by ex-Wife in exchange for certain payments and other contractual obligations. Accordingly, the Agreement does not create a trust with respect to the Flying Dutchman.

### III. *Defendants' Summary Judgment Arguments*

The fact that the Agreement did not make the ex-Wife beneficiary of a trust does not, of course, mean that it did not create contractual rights in her favor. Ex-Wife claimed in her initial complaint that Husband breached these contractual rights by the 1974 and 1984 conveyances to Widow in violation of § 2(A)(2) (the "sale" provision). In her amended complaint, ex-Wife realleges these breaches and adds an additional contention, that Husband breached the Agreement by not devising her the Flying Dutchman, in violation of § 2(A)(3). It is clear from an examination of the Agreement that only the allegation of § 2(A)(3)'s breach is properly before me.

By ex-Wife's own view of the Agreement, the universe of possibilities was divided by §§ 2(A)(2) and 2(A)(3) into two contingencies: that Husband would have at the time of his death sold the Flying Dutchman as provided in § 2(A)(2), or that he would not. I conclude later in this Opinion, for purposes of this motion, that no sale occurred as provided in § 2(A)(2). Therefore, under ex-Wife's view of the Agreement, § 2(A)(3) becomes operative, and the Agreement requires Husband to "by will devise" to ex-Wife a one-half interest in the Flying Dutchman. The 1974 and 1984 transfers of the property did not prevent such a devise. Husband, theoretically, was free to reacquire the property and devise as required in § 2(A)(3).

As of the time of his death, however, Husband had not reacquired legal title to the Flying Dutchman and made no attempt to devise it to ex-Wife. Thus, under ex-Wife's interpretation of the Agreement, Husband at his death was in breach.[6] The defendants claim that they are entitled to summary judgment with respect to ex-Wife's contractual claims because the undisputed facts demonstrate that: 1) Husband satisfied the requirements of the Agreement by completing the schedule of payments in compliance with § 2(A)(1); 2) Husband satisfied the requirements of the Agreement by selling the property in compliance with § 2(A)(2); 3) the 1973 warran-

---

**6.** Since under ex-Wife's view of the Agreement Husband was in breach of § 2(A)(3) at his death, I need not consider the problem as to whether the 1974 and 1984 transfers represented an actionable anticipatory breach of the Agreement.

ty deed from ex-Wife to Husband, the 1974 deed from Husband to Husband and Widow as tenants by the entireties, and the 1984 warranty deed from Husband and Widow to Widow create equitable and legal title in Widow which this Court is precluded from disturbing; 4) the suit is barred by the doctrine of laches; and 5) the suit is barred by the doctrine of equitable estoppel. These arguments are considered *seriatim.*

### A). The Agreement as a Contract for Deed.

■ The defendants' first argument is that the Agreement, with respect to the Flying Dutchman, was in the nature of a mortgage or contract for deed. In defendants' version, the payments to be made under § 2(A)(1) for "the ex-Wife's interest" in the Flying Dutchman were in the nature of purchase money, to be paid over a 20–year period, for ex-Wife's entire undivided one-half interest in the property. In defendants' view, provisions 2(A)(2) and 2(A)(3) provided security to ex-Wife should Husband sell the property or die before completion of the string of payments due under § 2(A)(1). This view, say defendants, is supported by Husband's deposition testimony, the fact that the one-half interest to be conveyed to ex-Wife upon sale or death is to be reduced by payments made under § 2(A)(1), by the fact that payments under § 2(A)(1) are "for [ex-Wife's] interest" in the property, and by certain actions of ex-Wife and Husband after the Agreement was executed.

Ex–Wife argues that §§ 2(A)(1), (A)(2) and (A)(3), are, except where the Agreement expressly provides otherwise, separate. Under ex-Wife's view, the payments made under § 2(A)(1) were for her support,

in a rough approximation of the income she would have received from her one-half share in the Flying Dutchman. The fact that § 2(A)(1) is concededly satisfied, has, in ex-Wife's view, no bearing on her contractual right to receive the property upon the death of the Husband under § 2(A)(3). Ex–Wife's deposition testimony indicates that this was the intention of the parties in executing the Agreement.

With respect to the interdependence of §§ 2(A)(1), 2(A)(2) and 2(A)(3), the Agreement is ambiguous.[7] Ex–Wife's interpretation is consonant with the Agreement's express terms. There is evidence in the record to support it. Therefore, for purposes of this motion, I cannot find that no dispute of fact exists over whether the intention of the parties executing this Agreement was that §§ 2(A)(2) and 2(A)(3) were only to provide security for payments due under § 2(A)(1), and that obligations under §§ 2(A)(2) and 2(A)(3) terminated upon satisfaction of the terms of § 2(A)(1). Husband has cited the venerable rule that in case of ambiguity an instrument is to be contrued against its drafter (here, ex-Wife). Though this rule may be useful when the finder-of-fact weighs the evidence and makes a decision as to the intention of the parties in executing the Agreement, it is inapposite at the summary judgment stage. *See Continental Oil Co. v. Pauley Petroleum Inc.,* Del.Supr., 251 A.2d 824 (1969). Therefore, for purposes of this motion only, I conclude that the ex-Wife's version of the Agreement is correct and that the contractual requirements of § 2(A)(3), which required Husband to "devise by will"[8] to ex-Wife a one-half interest in the Flying Dutchman, survive the completion of payments under § 2(A)(1).[9]

7. Both sides in this lawsuit have described the Agreement as "clear and unambiguous". Both sides, however, have also developed an extensive evidentiary record and have argued it to me as evidence that their interpretation of the Agreement is correct. Both sides have ignored the parol evidence rule as a bar to the admission of extrinsic evidence. *See Husband (P.J.O.) v. Wife (L.O.),* Del.Supr., 418 A.2d 994 (1980); *Scott–Douglas Corp. v. Greyhound Corp.,* Del.Super., 304 A.2d 309 (1973). The Agreement, to be charitable, is poorly drafted and, with respect to

the contractual obligations imposed by § 2(A), is ambiguous.

8. A phrase not unlike "murder by death".

9. The Husband completed payment of the $195,-000 due under § 1(A) several years before the time called for in the Agreement, delivering a lump sum final payment to ex-Wife in connection with the "sale" by quit-claim deed to Widow in 1987. Ex-Wife has not argued to me that there was a contractual failure to comply with

B). The Alleged Sale of the Property.

■ The defendants next claim to be entitled to summary judgment because, they say, they have satisfied the Agreement by selling the property in conformity with § 2(A)(2). That section allowed Husband to sell the property "at any time" for a sum not less than $180,000. One half of the net proceeds of such sale were to go to ex-Wife, subject to a charge for any payments she had received under § 2(A)(1), computed at the rate of $350 per month.

In order to evaluate defendants' summary judgment argument, one must review the circumstances under which this sale took place. Shortly after learning of the 1974 transfer of the property from Husband to Husband and Widow by the entireties and the 1984 transfer to Widow in fee simple absolute, ex-Wife filed this action for equitable relief. Defendants answered, raising some of the defenses argued here. Discovery was commenced, and on April 30, 1987, Husband's deposition was taken. At that time it was his correct belief that his death was imminent. On the day of the deposition, as a prophylactic measure to preserve the property for Widow and to prevent ex-Wife from taking a share, Husband and Widow entered into an "agreement of sale". This sales agreement was rapidly consummated. Under its terms, Widow was to "pay" Husband $180,000. This amount was decided upon as a result of the provisions of § 1(B). It was not the result of any negotiation. The $180,000 was borrowed against the Flying Dutchman from the First National Bank of Wyoming, which appraised the value of the property in connection with the loan at approximately $600,000. Of the $180,000 borrowed, $35,200 was sent to ex-Wife. This was actually more than ex-Wife was entitled to under the provisions of § 2(A)(2) and was intended to satisfy the amount outstanding as payments under § 2(A)(1).

Of the balance, $86,026.01 was deposited in Husband and Widow's joint checking account, and was used to reduce the outstanding principal on the loan. The remainder was apparently returned directly to the bank to reduce other outstanding obligations with respect to the property. In return for this "payment", Husband quit-claimed any interest he had in the Flying Dutchman to Widow.

Defendants claim that this transaction satisfied the letter of § 2(A)(2). There is, however, an implied covenant of good faith appended to every contract made in the State of Delaware. "Every contract contains the implied condition that the parties will act in good faith and deal fairly with each other in its performance." *Voege v. American Sumatra Tobacco Corp.*, D.Del., 241 F.Supp. 369, 375 (1965). *See* Restatement of Law, 2d, *Contracts*, § 205 (1981). The Agreement could have, but did not, provide that Husband could "cash out" any obligations under the contract by paying the ex-Wife the sum of $90,000 (one half of $180,000) less amounts paid under § 2(A)(1). This is precisely what Husband's actions, if allowed to satisfy § 2(A)(2), will transmute that section into. Under defendants' view, had Husband decided to sell the property at its fair market value (there is evidence before me to indicate that this was $970,000 at the time of Husband's death) he could have "sold" the property for $180,000 to a strawman, satisfied the obligations of the Agreement by paying ex-Wife $90,000 less payments made under § 1(A), repurchased the property for $180,000 and then sold it for the far higher fair market amount. This is clearly not what was intended by the parties to the Agreement, however. In the normal course of things a sale for the highest possible price would have benefited both Husband and ex-Wife equally. It is clear that what the parties meant by a "right to sell" was that the Husband had the right to consummate an arm's length transaction for a sale of the property when he felt it was to his advantage to do so. The Agreement did not contemplate a sham transaction for far less than market value. This is borne out by ex-Wife's deposition

§ 1(A) due to this accelerated payment. It appears that Husband has satisfied all conditions imposed upon him by that section.

testimony, in which she explains that, at the time of the Agreement, she and Husband felt that $180,000 was at or above fair market value for the Flying Dutchman. Given the intent of the parties, the express language of the Agreement and the implied covenant of good faith appended thereto, one can only conclude that the 1987 quit-claim "sale" of the property from Husband to Widow did not satisfy the terms of § 2(A)(2).

C). The 1973, 1974 and 1984 Deeds.

■ Defendants next argue that the 1973, 1974 and 1984 deeds create sole equitable and legal title in the Widow. I shall first consider the 1973 deed.[10]

■ This special warranty deed from ex-Wife to Husband purports to convey a fee simple estate in the Flying Dutchman. First, with respect to this deed, I will consider the doctrine of merger in deed, which is applicable in Delaware. *Reed v. Hassell,* Del.Super., 340 A.2d 157 (1975). While the parties have not adverted to this doctrine, I think it merits some discussion. When an agreement to sell real property is executed between two parties, it creates certain contractual rights. Under the doctrine of merger in deed, on the execution and delivery of a deed, the contract obligations of both parties are said to "merge" with the deed, and its terms become controlling. Unquestionably, however, the doctrine will not defeat a clearly evidenced intent by the parties that the contractual provisions of the sales agreement would survive. *Reed v. Hassell, supra.* That is precisely the situation we have here. The Ex–Wife's uncontradicted deposition testimony indicates that this deed was given only for the purpose that Husband use it to

secure loans to improve the property. Husband's deposition testimony and continued payments to ex-Wife under § 2(A)(1) make it clear that he intended that the Agreement would remain in force after execution and delivery of the deed. Therefore, the doctrine does not apply in this case.

■ Defendants next note that the 1973, 1974 and 1984 deeds were all special warranty deeds. 25 *Del.C.* § 121 provides that such deeds "shall be construed to pass and convey to the grantee therein and to his heirs and assigns the fee simple title or other the whole estate or interest which the grantor could lawfully convey in and to the property therein described." Defendants appear to argue that this section provides that a properly executed and acknowledged deed creates an irrebuttable presumption that the grantor intended to convey the largest estate possible, thus precluding this action for equitable relief in that it would defeat this presumed intent. This reasoning is flawed. First, special warranty deeds create only a rebuttable presumption that the grantor intended to convey all rights in the property to the grantee. *See Levin v. Smith, supra; Penieskice v. Short,* Del.Super., 194 A. 409 (1937). Second, the plaintiff in this action concedes that legal title is in Widow. She is not attacking that title, but is requesting that an equitable device, a constructive trust, be imposed upon the legal interest of Widow to effectuate the terms of the Agreement. This is not prevented by the operation of 25 *Del.C.* § 121.

Defendants make a more serious argument based on the deeds. In 1968 Delaware changed its former "period of grace" recording statute into a pure "race to the recorder's office" statute. *N & W Devel-*

---

**10.** Ex–Wife complains of the conditions under which the 1973 deed was obtained from her by Husband. The circumstances of which she complains are that Husband and his lawyer called her frequently at her home and place of business in Florida requesting that she make such a deed. This annoyed her. In addition, on one occasion while the children of the marriage were visiting their father in Delaware he telephoned ex-Wife in Florida and told her that if she did not execute the deed he would not

send the children home. After this harassment and threat to retain the children, ex-Wife said she obtained her attorney's advice and executed a deed in favor of Husband.

To the extent that this argument of ex-Wife constitutes an assertion that the 1973 deed is voidable due to duress I conclude that the behavior stated does not rise to the type of immediate threat of harm which constitutes duress. *See* 26 C.J.S. *Deeds* § 61 (1956).

*opment Co. v. Carey,* Del. Ch., C.A. No. 6885, 1983 WL 17997, Hartnett, V.C. (1983). 25 *Del.C.* § 153 provides in its entirety:

> "*Priority of deed concerning lands or tenements.* A deed concerning lands or tenements shall have priority from the time that it is recorded in the proper office without respect to the time it was signed, sealed and delivered."

This somewhat draconian statute is intended to promote prompt recording of deeds and allow reliance by purchasers on record title. Defendants point out that the 1974 deed giving the Widow rights in the property as tenant by entireties and the 1984 deed conveying sole title to her were both recorded prior to ex-Wife's recording of the Agreement in 1987. Therefore, in order to effectuate the purpose of the recording statute, defendants argue that no equitable lien can be placed upon the property.

■ A significant question remains as to whether Widow is entitled to the benefit of the recording statute.[11] I do not have to reach this issue, for the simple reason that the recording act refers to priority as among "deeds effecting lands or tenements" and the Agreement is *not* a deed.[12] The provision at issue here, § 2(A)(3) is, according to the ex-Wife's contentions, a contract provision binding Husband to devise to ex-Wife a one-half interest in the Flying Dutchman, subject to a charge based on the payments made under § 2(A)(1). The Agreement does not transfer an interest in land and does not cloud Widow's title to the property. The question is whether equity will impose a constructive trust upon that property to effectuate Husband's contractual commitments to ex-Wife. Since the Agreement is not a deed, 25 *Del.C.* § 153 does not apply, and the fact that the 1973, 1974 and 1984 deeds were recorded prior to the recording of the Agreement will not bar ex-Wife from receiving any equitable remedies based on the Agreement to which she is otherwise entitled.

### D). Laches.

Defendants next argue that the equitable doctrine of laches bars ex-Wife's claim. Defendants contend that if ex-Wife has a cause of action, it accrued on November 12, 1974. This is the date of the recording of the deed from Husband to Husband and Widow as tenants by the entireties. Defendants' contention is that if ex-Wife had a valid contract requiring Husband to devise her the Flying Dutchman, this transfer of the survivorship interest to Widow was a breach of that contract. The intervening 13 years represent unreasonable delay, say defendants, and they have been disadvantaged by this delay to the extent that Widow has put more effort into the property than she would have if she had known of ex-Wife's interest, and in that Husband has now died and cannot testify at trial.

■ Without deciding whether a claim based on anticipatory breach was perfected by the 1974 deed, it is clear that a cause of action did not accrue under § 2(A)(3) until Husband's death in 1987. The claim is based on a contract to will. By its nature, this claim cannot have accrued until the death of the testator. *Snyder v. Baltimore Trust Co.,* Del.Super., 532 A.2d 624 (1986). *See Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254 (1969). The original complaint in this case was filed before Husband's death, and the amended complaint shortly thereafter. Even were I to accept defendants' improbable assertion that one who has a contractual claim involving a piece of property has the duty to check frequently for changes in

---

**11.** This is because it is clear from the record that the Widow was not a purchaser for value. The Delaware recording statute as it existed prior to 1968 contained an express requirement that those entitled to its benefits be purchasers for value. This requirement appears to have been eliminated in the current version of the statute. Other states with "race" recording statutes (albeit not identical to Delaware's) impose a "purchaser for value" requirement upon those seeking the protection of the statute, however. *See* N.C.Gen.Stat. § 47–18(a) (1984); La.Rev. Stat. An. § 9:2721 (1965).

**12.** Black's Law Dictionary provides: Deed: A conveyance of realty, a writing signed by the grantor, whereby title to realty *is transferred* from one to another. *5th ed. (1979)* page 373 (emphasis supplied).

the record title to that property, ex-Wife's suit was in place when her cause of action accrued at Husband's death, and therefore in no sense can she be said to have slept on her rights to the detriment of the defendants. Therefore, the doctrine of laches does not apply as a bar in this matter.

### E). Equitable Estoppel.

 Finally, defendants argue that they are entitled to summary judgment in that this suit is barred by the doctrine of equitable estoppel. Defendants' claim is that in executing the 1973 deed, which purported to be a warranty deed granting fee simple absolute title to Husband, ex-Wife misled Widow to believe that Husband in fact owned a fee simple absolute, free of ex-Wife's contractual claims, in the Flying Dutchman. In reliance upon that conduct of ex-Wife, defendants claim Widow believed that the 1974 and 1984 deeds gave her, first, an interest in the property by the entireties and, second, fee simple absolute ownership to the property, free of any contractual claims of ex-Wife. Finally, defendants claim that Widow acted on this belief to her detriment, in that she put more time and effort into the property than she otherwise would have. This, say defendants, constitutes the equitable ground for an estoppel, citing *Wilson v. American Insurance Co.*, Del.Supr., 209 A.2d 902 (1965); *Gottlieb v. McKee*, Del. Ch., 107 A.2d 240 (1954).

"To establish an estoppel, it must appear that the party claiming the estoppel lacked knowledge and the means of knowledge of the truth of the facts in question, that he relied on the conduct of the party against whom the estoppel is claimed, and that he suffered a prejudicial change of position in consequence thereof." *Wilson v. American Insurance Co., supra.* The record does not support defendants' claim for an equitable estoppel. First, no evidence exists that Widow actually relied upon the 1973 deed as evidence of Husband's ownership. Nothing in the record so indicates, and it seems likely that upon receiving the gift of ownership by the entireties in 1974 or of fee simple absolute in 1984, Widow simply believed Husband's assertion that

he owned the property, rather than conducting a title search. Even were I to assume the existence of reliance, I could not find that Widow relied to her detriment. There is evidence that Widow worked hard to maintain and improve the property after 1974. There is no evidence, however, to indicate that she worked harder than she would have if she had been aware of the provisions of the Agreement. The Flying Dutchman was Widow's family business and sole source of income. I cannot assume that she would have worked less hard if she had known of ex-Wife's potential claim. In fact, the evidence is that Widow was "working herself silly" on the property at the time of Husband's deposition, some time after the suit had been filed and Widow learned of ex-Wife's claim. Therefore, I cannot conclude on the record before me that Widow relied upon or suffered any detriment as a result of ex-Wife's actions, and equitable estoppel does not bar this action. *Wilson v. American Insurance Co., supra; Timmons v. Campbell,* Del. Ch., 111 A.2d 220 (1955).

### IV. *Summary*

 The Agreement does not create an express trust with ex-Wife as the beneficiary. Given the evidence before me, I cannot, however, grant to defendants summary judgment with respect to ex-Wife's claim for the breach of a contract to will. In a proper case, equity, to enforce a contract to will, may impose a constructive trust upon property. *Snyder v. Baltimore Trust Co., supra; Equitable Trust Co. v. Hollingsworth,* 49 A.2d 325 (1946). This can be true even where the property which was to have been willed has been transferred to a third party before testator's death. *See Brewer v. Simpson,* 53 Cal.2d 567, 2 Cal.Rptr. 609, 349 P.2d 289 (1960); *Shackleford v. Edwards,* Mo.Supr., 278 S.W.2d 775 (1955). The parties have not placed the question before me, and I shall not here decide, whether the equities are present to impose such a trust in the instant case. I note in passing, however, that while Widow did not take her interest in the Flying Dutchman for value, there is no record evidence indicating that she was aware

that ex-Wife had any claim against the Flying Dutchman other than the monthly payments due under § 2(A)(1). Widow has lived and worked on the property for 16 years. Apparently, she now supports herself and the minor child of her marriage with Husband out of the proceeds she receives from the Flying Dutchman. Should ex-Wife prevail at trial with respect to her construction of the Agreement, in order to impose a constructive trust she must demonstrate that the equities would so require.

I also note that to the extent this case involved an equitable claim based on breach of fiduciary duty by a trustee, that claim is no more. What remains is a legal claim, breach of contract, for which an equitable remedy, imposition of a constructive trust, is sought. Defendants have not put before me the question whether an adequate remedy at law, in the form of suit for damages for breach of contract against Husband's estate, exists.

For the foregoing reasons, summary judgment is denied.

IT IS SO ORDERED.